**Shannon PEASE, et al.**

v.

**AMERICAN CYANAMID CO.**

**Civ. No. JFM–91–1654.**

United States District Court,
D. Maryland.

June 18, 1992.

Gary I Strausberg, Baltimore, Md. for plaintiffs.

James Robertson, Juanita A. Crowley, Roger W. Yoerges, Wilmer, Cutler & Pickering, Washington, D.C., for defendant.

MOTZ, District Judge.

## OPINION

Shannon Pease, a seven year old girl, is mentally retarded and suffers from a myoclonic seizure disorder. She has (through her mother) brought this action against American Cyanamid Company, Lederle Laboratories Division ("Lederle") alleging that her mental retardation was worsened and her seizure disorder caused by the pertussis component of Tri–Immunol, a diphtheria-tetanus-pertussis ("DTP") vaccine manufactured by Lederle. Lederle has moved for summary judgment.

## I.

Plaintiff was born on July 8, 1984. On January 20, 1986, she received her fourth DTP shot. According to her mother, shortly thereafter she developed a fever of 102° and began to shake. Her eyes rolled, her head fell back and she developed a rash. She was hospitalized for five days, and both during her hospital stay and after her discharge she experienced seizure episodes. Her disorder has progressively worsened to the point where she currently experiences over 100 seizures a day.[1]

Pertussis is commonly known as whooping cough. It is an extremely serious disease, particularly among children, and

---

1. Prior to January 20, 1986, plaintiff had been examined by a specialist in neuro-developmental pediatrics at the Kennedy Institute for Handicapped Children. He made a diagnosis of "substantial cognitive delay" and found that Shannon was in the "mild to moderate range of retardation." However, plaintiff apparently had not suffered from any seizures prior to January 20, 1986.

plaintiff does not dispute that sound public health policy requires that there be a vaccination program directed against it. In January 1986 (when plaintiff was inoculated with the dose here in question) Tri–Immunol was the only type of DTP vaccine which was licensed for sale in the United States by the Food and Drug Administration.

The pertussis component of Tri–Immunol is made from whole, inactivated *Bordetella pertussis* cells. For several decades there has been a debate within the medical and scientific community as to whether whole cell pertussis vaccine is capable of causing permanent neurological damage. The first major epidemiological study on the question was conducted by the National Childhood Encephalopathy Study ("NCES") in Britain from 1976 through 1979. The report of the NCES estimated that there is a risk of "persistent neurological damage" in 1 of 310,000 immunizations administered to "previously normal children." Although the report expressly stated that this estimate "should be interpreted with extreme caution" in light of the range of assumptions and the small number of statistics upon which it was based, the fact that the estimate was made at all inevitably contributed to public concern about the safety of whole cell vaccine.

The NCES report followed an incident which occurred in Japan in the winter of 1974–1975 when two infants died in Japan after being inoculated with whole cell vaccine. Japanese authorities thereafter temporarily suspended the use of such vaccine. Although the suspension was promptly lifted, usage of DTP vaccine in Japan declined precipitously, and the incidence of whooping cough quickly climbed to epidemic levels. In 1979 13,105 cases of the disease were reported in Japan, and 41 persons died from it.

Against this background the Japanese Ministry of Health and Welfare initiated and funded a DTP vaccine research and development program. Under this program Japanese scientists developed an acellular pertussis vaccine, produced from the fluid in which the pertussis organisms are grown instead of from the whole pertussis cells themselves. In October 1982 the Japanese regulatory authorities approved use of the acellular vaccine. They had conducted safety tests, but not extensive controlled efficacy trials, before granting this approval.

During the 1980s several manufacturers sought approval of licenses for acellular DTP vaccine in the United States. However, it was not until December 1991 that the FDA approved use of the vaccine by granting a product license to Lederle. Even now, acellular vaccine is approved only for use in booster doses because of the FDA's continuing concern that it has not been proven to be efficacious when administered to very young infants.

Thus, the DTP vaccination program in the United States is still today founded upon whole cell vaccine.[2] Within recent years numerous governmental and professional bodies have issued reports which have addressed the question of whether such vaccine causes permanent neurological damage. Among the authorities issuing such reports are the Institute of Medicine (mandated by Congress to conduct a study of the issue under the National Childhood Injury Act of 1986, 42 U.S.C. §§ 300aa–1 et seq.), the Centers for Disease Control, the Child Neurology Society, the American Academy of Pediatrics, the American Academy of Neurology, the British Pediatric Association and the National Advisory Committee on Immunization of Canada. All of these groups have concluded that existing data and knowledge does not demonstrate that there is any causal connection between whole cell DTP vaccine and permanent neurological damage. In

---

**2.** In the 1950's Eli Lilly Company had developed a split cell vaccine which it marketed as "Tri–Solgen." For many years this vaccine was considered to be the best available product, and Lilly dominated the market. However, Lilly ceased manufacturing vaccines in 1976. In 1979 an FDA advisory panel raised serious doubts about Tri–Solgen's efficacy in light of the fact that it had never been subjected to controlled field testing, and in 1982 the FDA refused to grant a split cell license to Wyeth Laboratories, which had purchased Lilly's rights in the vaccine. The FDA has not since granted a license for any split cell vaccine.

November 1989 (more than three and a half years after plaintiff received the dose of vaccine here in question) the position of the U.S. Department of Health and Human Services, as stated in an *amicus curiae* brief which it filed in the Fourth Circuit, was that government regulators and professional associations were "unaware of any other pertussis vaccine produced in the world today that has been adequately demonstrated to be both safer than and as effective as the 'whole cell' vaccine licensed ... for sale [in the United States." Brief for the United States, *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970 (4th Cir. 1990).

## II.

█ Lederle's motion for summary judgment is based upon two grounds: that plaintiff cannot prove either that her condition was caused by her vaccination with Tri–Immunol or that Tri–Immunol is a defective product.

Lederle's causation argument is premised upon the contention that the opinions of plaintiff's experts are inadmissible because they are based upon data and theories which are not reasonably relied upon by experts in the field of vaccine science. The difficulty with this contention is that, although Lederle argues to the contrary, it is substantively little different from an assertion that an expert's testimony should be excluded because it is innovative or against the weight of authority. As such, the contention would fail. *See, e.g., Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535–36 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Clinchfield R.R. v. Lynch*, 784 F.2d

545, 554 (4th Cir.1986). Of course, there may be instances where the court is persuaded that a particular opinion, although expressed by a qualified expert, is so utterly without objective basis that its admission into evidence would not serve the truth-seeking process. Here, however, there is some support, scant though it may be, in the existing body of knowledge (including individual case studies, the NCES epidemiological study and writings advancing a theory of biological plausibility) for the opinions which plaintiff's experts posit. Therefore, strictly from the perspective of causation, I am not prepared to rule that these opinions may not be considered. To do so would, in my mind, be to embody in the law an excessive deference to established authority on a question of continuing scientific uncertainty.

█ Lederle's causation argument, however, merges into its substantive contention that Tri–Immunol is not a defective product. On that plane I find the argument to be compelling. In order to prove that a product is in a defective condition, a plaintiff must prove that it is "unreasonably dangerous." *See, e.g., Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955, 959 (1976).[3] Briefly put, how can Tri–Immunol be said to be *"unreasonably dangerous"* if there is a strong consensus among the majority of physicians and scientists who have studied the issue that whole cell DTP vaccine has not been shown to cause permanent neurological damage and that it is at least as efficacious as any other available vaccine?[4] To me, this question answers itself, and to say more risks losing the forest for the trees. However, hyperopia can blur vision as much as

**3.** Plaintiff's ultimate burden is the same whether her claim is characterized as one for "strict liability," negligence or breach of warranty. *See, e.g., Singleton v. International Harvester Co.*, 685 F.2d 112, 115 (4th Cir.1981); *Miles Laboratories, Inc. v. Doe*, 315 Md. 704, 556 A.2d 1107, 1123 (1989); *see also Ackley v. Wyeth Laboratories, Inc.*, 919 F.2d 397, 403 (6th Cir. 1990); *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). Under any of the three theories the issue to be determined is "whether a manufacturer, knowing the risk inherent in his product, acted reasonably in put-

ting it on the market." *Singleton,* 685 F.2d at 115.

**4.** Lest too much be read into what I have said, I note that Tri–Immunol is a product which is heavily regulated by public authorities and has been the subject of close and extensive scrutiny by numerous physicians and scientists unrelated to Lederle and other pharmaceutical companies. Thus, this is not a case in which the defendant seeks to justify its product merely by reference to prevailing industry standards.

myopia, and a slightly more focused discussion is therefore warranted.

In cases involving an alleged design defect, the Maryland courts apply a seven-factor test in determining whether the product is unreasonably dangerous:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole;

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury it will cause;

(3) The availability of a substitute product which would meet the same need and not be as unsafe;

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility;

(5) The user's ability to avoid danger by the exercise of care in the use of the product;

(6) The user's anticipated awareness of the dangers inherent in the product and ability to avoid the dangers, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions;

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Phipps v. General Motors Corp.*, 278 Md. 337, 345, 363 A.2d 955 (1976); *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 426 n. 3, 475 A.2d 1243, 1252 n. 3 (1984); *Sheehan v. Anthony Pools*, 50 Md.App. 614, 620–21 n. 6, 440 A.2d 1085, 1098 n. 6 (1982), *aff'd* 295 Md. 285, 299, 455 A.2d 434, 441 (1983).

Here, the first of these factors indisputably is in favor of Lederle, and the last four weigh in favor of plaintiff. Therefore, the critical questions presented are those posed by the second and third factors. What is the likelihood that Tri-Immunol will cause injury and what is the probable seriousness of any such injury? Could Lederle have marketed a substitute DTP vaccine which would have been safer than, and as effective as, Tri-Immunol?

Plaintiff contends that the proffered testimony of her experts create genuine disputes of material fact as to each of these questions. The fallacy in this contention is that what is material to the legal issue, as properly framed, is the fact that, assuming a genuine dispute between experts exists, there is a substantial body of expert opinion, supported by extensive studies conducted by independent professionals, that the whole cell vaccine is at least as safe and efficacious as acellular vaccine. To state this proposition is not to attempt to resolve the underlying scientific dispute. It merely is to recognize that in a case such as this the legal issue and the scientific question are not the same. Of course, the law can—and must—require manufacturers to foster and pay heed to the development of scientific knowledge. *See West-inghouse Electric Corp. v. Nutt*, 407 A.2d 606, 611 (D.C.App.1979) (manufacturer must keep abreast and informed of developments in his field). However, where there is a genuine disagreement on a particular question and where the weight of scientific knowledge supports the judgment reached by a manufacturer who is marketing a socially desirable product, the law cannot permit a jury merely to substitute its own judgment that another product, preferred by plaintiff's experts, would be better. Were it to do so, the law itself would be "inherently unreasonable," presenting manufacturers with a choice between Scylla and Charybdis.

One final aspect of this issue should be noted. *Doe v. Miles Laboratories, Inc.*, 927 F.2d 187, 190–91 (4th Cir.1991), clearly provides me with the latitude to engage in the type of analysis which I have made. There, the Fourth Circuit, in applying Maryland law to a case involving a product alleged to be "unavoidably unsafe" within the meaning of *Restatement of Torts* (Second), § 402A, comment k, broadly stated as follows:

We believe that the applicability of strict liability in tort under § 402A to a particular product involves important policy issues that should be considered and weighed by a court of law.... If the

relevant determination requires that controverted material factual issues be decided, then the task must be given to the trier of fact. . . . However, the final balancing of policies based on any factual findings should be made by the court to ensure a legal consistency, which cannot be fostered by several triers of fact. . . . *Id.* at 191 (footnotes omitted). While being bound (and thus freed) by *Doe* to conduct my own balancing test, I confess to some doubt as to whether the Fourth Circuit properly cited Maryland law for the proposition which it stated. The case upon which it relied, *Lundgren v. Ferno–Washington Co.*, 80 Md.App. 522, 565 A.2d 335 (1989), held only that the court is to make "an initial determination as to whether the product involves an 'inherently unreasonable risk.' " 80 Md.App. at 528, 565 A.2d at 338. The court went on to say that "only in those cases where the risk is not inherently unreasonable is the jury called upon to apply the balancing test to determine whether a product is reasonably safe." *Ibid.* Here, plaintiff has not alleged that Tri–Immunol presents an inherently unreasonable risk, and *Lundgren* might therefore be seen as relegating the balancing decision to the jury.

Nevertheless, I am satisfied that my reasoning is not inconsistent with any decision of the Maryland courts. I have only decided that, in considering the second and third of the *Phipps* factors, a court must consider all pertinent data and professional literature in determining whether summary judgment is appropriate. The testimony of plaintiff's experts cannot be considered in isolation. Even if their opinions are credited as plausible, when they are viewed in the full context of existing scientific knowledge, they merely create the possibility that whole cell vaccine causes permanent neurological damage and that acellular vaccine is an equally efficacious and better alternative. *Cf. Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 242 (4th Cir. 1982). Under these circumstances nothing in Maryland law requires that a court must leave it to the jury's whim to determine whether Tri–Immunol is an unreasonably unsafe product.

## III.

There is a related, narrower ground upon which Lederle is entitled to summary judgment. In order to establish, as the third *Phipps* factor requires, that acellular vaccine was available as an alternative to Tri–Immunol at the time that plaintiff was vaccinated, plaintiff must prove, *inter alia,* that Lederle could have manufactured— and that the FDA would have licensed— acellular vaccine by January 1986.[5] To the extent that this argument suggests that the FDA would have approved the Japanese acellular vaccine by January, 1986, it is frivolous. The record is undisputed that by that time clinical efficacy trials meeting the FDA's testing requirements had not yet been conducted.

To the extent that the plaintiff's argument is based upon the proposition that Lederle should have developed its own acellular vaccine at a sufficiently early time to permit the vaccine to have been licensed by the FDA by January 1986, it is entirely speculative. It is true, as plaintiff contends, that in 1937 Lederle had obtained a patent for an acellular product and that there are memoranda in Lederle's files reflecting that some of its scientists believed that an effective acellular vaccine could be developed. However, as stated by Judge Weinstein in *Jones v. Lederle Laboratories,* 785 F.Supp. 1123 (E.D.N.Y.1992), "it was not until 1979 that the recipe for an effective acellular vaccine was developed by pioneering efforts of the Japanese." It simply cannot be inferred, as plaintiff's experts infer, that Lederle would itself have

---

5. Plaintiff makes an ancillary contention that Lederle should have manufactured, as an alternative to its whole cell vaccine, a split cell vaccine similar to "Tri–Solgen," the vaccine developed by Eli Lilly Company in the 1950's and marketed by it until approximately 1976. There are two short answers to this contention. First, Mark R. Geier, one of plaintiff's experts, has himself testified on deposition that Tri–Solgen was an unreasonably dangerous product. Second, it is undisputed that since the time that Lilly withdrew from the vaccine business, the FDA has refused to license any split cell vaccine.

made the necessary breakthroughs in research to create this recipe had it devoted its resources to development of an acellular vaccine. Their testimony on the point merely constitute "hindsight opinions" and, as such, clearly are inadmissible under Fourth Circuit precedent. *See, e.g., Doe v. Miles Laboratories, Inc.*, 927 F.2d 187, 194 (4th Cir.1991); *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 338 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

A separate order entering summary judgment in favor of Lederle is being entered herewith.

### ORDER

For the reasons stated in the Opinion entered herein, it is this 18th day of June, 1992

ORDERED that

1. Defendant's motion for summary judgment is granted; and

2. Judgment is entered in favor of defendant against plaintiff.