William TANNEBAUM,
et al., Plaintiffs,

v.

YALE MATERIALS HANDLING
CORPORATION, Defendant.

No. Civ. AMD 97–3398.

United States District Court,
D. Maryland.

March 16, 1999.

John R. Sutherland, Seidenman, Sutherland & Lynn, Baltimore, MD, for plaintiff.

Donald E. Sharpe, Piper & Marbury, Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff William Tannebaum was severely and permanently injured in a work-related forklift accident. He and his wife have filed a products liability action based on Maryland law in this diversity case. Defendant, the successor to the manufacturer of the forklift at issue, has moved to exclude the testimony of plaintiffs' expert (a second expert was withdrawn) and for summary judgment. Although I would deny the motion to exclude and allow the expert to testify at trial, for the reasons set forth below, even considering the plaintiffs' expert opinion evidence, the defendant is entitled to judgment as a matter of law and therefore its motion for summary judgment shall be granted.

(i)

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment if, when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Id.* at 248–49, 106 S.Ct. 2505. The opposing party's "response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence" will not support this finding. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. *Summary judgment must be entered against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact....'"* *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (emphasis added). In deciding the motion, the Court must view all inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

(ii)

The facts material to the pending motion are undisputed. Tannebaum began working as an assistant manager for a local grocer in October 1993. Among his responsibilities was the task of baling and

binding empty cardboard boxes and then loading the bales into a transport trailer. To do this, Tannebaum used a baler located in the rear of the store to compress the cardboard boxes. The baler crushed the boxes and Tannebaum would then bind the resulting bales with five wire bands, securing the bands closed with pliers. Tannebaum estimated that each bale measured approximately five feet in length, three to four feet in width and three feet in height. Each bale weighed several hundred pounds, generally in the range of from 700 to 800 pounds.

After the bales were formed, Tannebaum used the forklift to stack the bales three high onto a wooden pallet and then to load the pallet into the trailer at the loading dock in the rear of the store. As a matter of routine, the three bales resting on the pallet were neither strapped together, nor were they secured to the pallet, before Tannebaum loaded the pallet on which they were stacked into the trailer.

This latter fact created an extraordinarily dangerous situation, as several warnings in the operators' manual and on a placard attached to the forklift admonished. That is, the height of the three bales was such that the middle bale in the stack of three bales would exceed the height of the forklift's "load backrest," and the top bale of the three bales would rest *completely above* the height of the "load backrest." (The load backrest is a portion of the carriage and fork mechanism that supports the load when it is tilted rearward or upward.). Thus, if, in the event of careless stacking (or as a result of a sudden jolt or collision), the top bale were knocked askew, there existed a significant risk that it would tumble from its unsecured perch. That is exactly what happened at about 9:00 a.m. on November 8, 1994.

Tannebaum was loading a pallet stacked with three bales using the forklift, as was his usual practice. He contends that the forklift was at rest at the opening of the trailer. Prior to or as he began to raise the forks to deposit the load into the trailer. Prior to or as he began to raise the forks to deposit the load into the trailer, the top bale on the stack fell toward the operator's compartment. Tannebaum alleges that a portion of the bale penetrated into the gap between the overhead guard bars and struck him in the head, knocking him backward and propelling him out of the operator's compartment of the forklift. The bale of cardboard then fell on him, crushing his legs and causing severe injury.

Almost mantra-like, Tannebaum reiterates again and again in his papers, and then at the hearing on the pending motions, as well, the contention that "a portion of the bale penetrated into the [5.9″] gap between the [overhead] guard bars, intruded into the operator's compartment, and struck [him] in the head." *See* Response at 1. In fact, photographs of the accident scene taken shortly after the occurrence and other undisputed evidence in the record make it clear beyond a reasonable doubt that it is physically impossible for the accident to have occurred in this fashion.

The approximately five feet long cardboard bale was banded with five steel straps, and was resting lengthwise on its perch less than six feet from where Tannebaum's head would have been below the steel overhead guard fitted on the forklift. *See* Def.'s Exhs. 3, 8 and 9. There is simply no way that, once the huge banded bale, weighing in excess of seven hundred pounds, began to fall toward the rear of the forklift, "a portion" of it could have "penetrated" into the operator's compartment through one of the 5.9″ openings in the bars comprising the overhead guard, strike Tannebaum in the head, and then only reach floor level after Tannebaum had been knocked prone to the floor at the rear of the forklift.

Nor does Tannebaum (or anyone else) testify that he saw the bale "protrude" into the operator's compartment through the overhead guard. Rather, he testified that he observed the bale begin to fall toward the overhead guard, but he admits that he

did not see the alleged "penetration" of a portion of the bale into the operator's compartment. No one witnessed the accident. Thus, the "fact" that a "portion" of the 700–800 pound bale "intruded" into the operator's compartment is in actuality an amalgam of "fact" and attorney argument.

There is substantial evidence in the record (including a photograph of a co-worker so demonstrating) that Tannebaum, who I was told at oral argument is approximately 75″ tall, habitually operated the forklift while leaning back and out from under the overhead guard, the bottom of which is a mere 74″ from the base of the operator's compartment. *See* Def.'s Exh. 9. A fact finder would be compelled to conclude on the evidence that almost certainly, the descending bale struck Tannebaum (knocking him from the forklift) while he was *outside* the protective cover of the overhead guard as he leaned back, and would reject the assertion that a "portion" of the bale "penetrated" the overhead guard. Nevertheless, despite the simple physics of the matter (informed by common sense), defendant concedes, grudgingly and understandably, that a genuine dispute of material fact is generated in these regards.

\*  \*  \*  \*  \*  \*

The forklift used by Tannebaum is a NE040 model, stand-up, narrow-aisle electric truck, whose smaller external dimensions permit its operation in narrower aisles than would be possible in similar, larger units having the same load capacity. It was designed in about 1973 and manufactured in 1983 by Yale Industrial Truck Division of Eaton Corporation. The forklift was originally purchased by the Parke–Davis division of Warner Lambert Corporation ("Warner Lambert"). At the time Warner Lambert purchased the forklift in 1983, Yale's customers could select various optional safety devices to equip a forklift depending on the intended use of the forklift. A *side entry* modification with a *rear guard*, but not a rear door, as well as a wire mesh overhead covering, were among the options available in 1983. Warner Lambert, which purchased several dozen forklifts from the manufacturer before it purchased the one at issue, did not request either option, although there is no evidence reflecting that these options were *specifically brought to Warner Lambert's attention* by the manufacturer.

On the date of the sale to Warner Lambert (as well as at present), the forklift complied fully with applicable Occupational Safety and Health Administration ("OSHA") regulations and with all applicable American National Standards Institute ("ANSI") manufacturing standards. When the manufacturer delivered the forklift to Warner Lambert, it was accompanied by an owner's manual which was inserted into a pocket attached to the side of the forklift. In addition, a warning placard affixed to the operator's compartment of the forklift contained numerous critical instructions and warnings. The placard is reproduced below:

# Warning to the operator—

for your safety and the safety of others

1. **Know Your Truck** — Do not operate this truck unless you have been trained and authorized to do so. Read all warnings and instructions in operator's manual on this truck, or obtain from plant Safety Director or the local Yale representative.
2. **Check Your Truck** — Truck should be checked daily before being placed in service. If found to be in need of repair, defective, or in any way unsafe it should be reported immediately to the proper authority and the truck removed from service until it has been restored to safe operating condition.
3. **Keep Inside** — Operate truck only from designated operating position. Never place any part of your body into the mast structure, between the mast and the truck, or outside the truck. Do not carry passengers.
4. **Protect Yourself** — Do not operate truck without an overhead guard or load backrest extension, unless conditions prevent their use. Use special care if operation without these guards is required.
5. **High Loads** — Do not handle loads which are higher than the load backrest or load backrest extension unless load is secured so that no part of it could fall backward.
6. **Stabilize Your Load** — Do not handle unstable or loosely stacked loads. Use special care when handling long, high or wide loads, to avoid losing the load, striking bystanders, or tipping the truck.
7. **Center Your Load** — When using forks space forks as far apart as load will permit. Before lifting, be sure load is centered and forks are completely under load.
8. **Never Overload** — Do not overload truck. Check capacity plate for load weight and load center information.
9. **Avoid Sudden Movement** — Start, stop, travel, steer and brake smoothly. Use special care when traveling without load as the risk of overturn is greater.
10. **Look Overhead** — Elevate forks or other lifting mechanism only to pick up or stack a load. Lift and lower with mast vertical or tilted slightly back — NEVER FORWARD. Watch out for obstructions, especially overhead.
11. **Minimum Tilt** — Operate tilting mechanism slowly and smoothly. Do not tilt forward when elevated except to pick up or deposit a load. When stacking use only enough backward tilt to stabilize load.
12. **Eyes Ahead** — Travel with load or lifting mechanism as low as possible and tilted back. Always look in direction of travel. Keep a clear view, and when load interferes with visibility, travel with lifting mechanism trailing (except when climbing ramps).
13. **Care On Ramps** — Use special care when operating on ramps — travel slowly, and do not angle or turn. When truck is loaded, travel with load uphill. When truck is empty, travel with lifting mechanism downhill.
14. **Slow Down** — Observe applicable traffic regulations. Yield right of way to pedestrians. Slow down and sound horn at cross aisles and wherever vision is obstructed.
15. **Watch People** — Do not allow anyone to stand or pass under load or lifting mechanism.
16. **Use Work Platform** — Do not lift personnel except on a securely attached, specially designed work platform. Use extreme care when lifting personnel. Place mast in vertical position, place truck controls in neutral and apply brakes. Lift and lower smoothly. Be available to operate controls as long as personnel are on the work platform. Never transport personnel on forks or work platform.
17. **Shut Down Completely** — Before getting off truck, neutralize travel control, fully lower lifting mechanism and set parking brake. When leaving truck unattended also shut off power. Block wheels if truck is parked on an incline.

# Failure to comply with these warnings will create an unreasonable risk of injury to yourself and others.

All rider trucks except high lift order pickers          5179908-00

Tannebaum never saw or read the operator's manual; the record is silent as to whether his employer ever obtained a copy of the operator's manual when it pur-

chased the forklift in the resale market. Nor did he ever see the warning placard (reproduced above) attached to the operator's compartment because by the time he began to operate the forklift after it had been purchased second-hand by his employer, the placard had been removed or painted over. Tannebaum had no prior experience with forklifts and received at most rudimentary "on-the-job" instruction by co-workers at the grocery store. He testified on deposition that if he had knowledge of the important instructions and warnings provided by the manufacturer to Warner Lambert, and in particular numbered paragraph 5 above (cautioning against "High Loads"), he would have adhered to such warnings, notwithstanding his employer's contrary instructions.

### (iii)

Plaintiffs sue in three counts. They allege in count one a claim for strict products liability based on defective design, insofar as the forklift was designed without a wire mesh (or similar) covering over the operator's compartment, whose presence allegedly would have prevented the falling bale from "penetrating" into the operator's compartment and striking Tannebaum. They allege in count two a claim for strict products liability, also based on defective design, insofar as the forklift lacked a rear door, whose presence would have prevented Tannebaum's ejection from the operator's compartment despite the blow allegedly delivered to his head propelling him backward. Finally, they allege in count three a derivative claim for loss of consortium.

▮ The general outline of products liability claims in Maryland was set forth in *Singleton v. Manitowoc Co., Inc.,* 727 F.Supp. 217, 220 (D.Md.1989), *aff'd,* 931 F.2d 887, 1991 WL 64953 (4th Cir.1991) (table):

To recover on a theory of strict liability in Maryland, a plaintiff must establish that:

(1) the plaintiff was the user or consumer of an alleged defective product;

(2) the defendant was the seller of the product and at the time of sale was engaged in the business of selling such a product;

(3) at the time of sale the product was defective;

(4) the product reached the plaintiff without substantial change in the condition in which it was sold;

(5) the defect made the product unreasonably dangerous to the plaintiff; and

(6) the defect proximately caused plaintiff's injuries.

*See Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976); Restatement (Second) of Torts § 402A (1965). A product defect, which renders the product unreasonably dangerous, might arise from the design of the product, a deficiency in its manufacture or from the absence or inadequacy of any instructions or warnings as to its safe and appropriate use. *Simpson v. Standard Container Co.,* 72 Md.App. 199, 203, 527 A.2d 1337, 1339–40, *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987). As mentioned above, in this case, Tannebaum alleges solely design defect claims.

There is some disagreement between the parties as to the proper legal standard. This is not unexpected. As Judge Calabresi recently observed:

Products liability law has long been bedeviled by the search for an appropriate definition of "defective" product design. Over the years, both in the cases and in the literature, two approaches have come to predominate. The first is the risk/utility theory, which focuses on whether the benefits of a product outweigh the dangers of its design. The second is the consumer expectations theory, which focuses on what a buyer/user of a product would properly expect that the product would be suited for.... Not all states accept both of these ap-

proaches. Some define design defect only according to the risk/utility approach.... Others define design defect solely in terms of the consumer expectations theory.

*Castro v. QVC Network, Inc.*, 139 F.3d 114, 116–17 (2d Cir.1998) (citations and footnotes omitted). He also noted that "[s]till others apply a 'modified consumer expectations test' that incorporates risk/utility factors into the consumer expectations analysis." *Id.* at n. 5. (citations omitted).

Undoubtedly, Maryland is among the states which accept and apply both tests. *Ziegler v. Kawasaki Heavy Indus., Ltd.*, 74 Md.App. 613, 619–25, 539 A.2d 701, 704–07, *cert. denied*, 313 Md. 32, 542 A.2d 858 (1988). *See* John F. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Design Defects—A Survey of the States Reveals a Different Weave*, 26 U.MEM.L.REV. 493, 707 (1996) ("It would appear that Maryland law, as defined by its highest court, applies .... the consumer expectation test ... to design defects; however, should such a test prove inappropriate, the consumer can use the risk-utility test as a viable alternative. The development of this dual standard by Maryland's highest court is based, to a great extent, on its concern that consumers should not be confronted with the almost impossible burden in proving negligence.") (footnotes omitted). *But see Singleton*, 727 F.Supp. at 221 ("If it is concluded that a design defect existed at the time of sale, the analysis would then of necessity turn to the issue whether the defect created an unreasonable danger. That analysis requires a weighing of the utility of risk inherent in the design against the magnitude of the risk.").

In this case, defendant seems to contend that the "consumer expectation" test as formulated and interpreted in *Singleton* should apply, as the forklift is an industrial product sold to a "sophisticated user" and not a "consumer good" intended for laypeople without special knowledge of its function and characteristics. Tannebaum contends that the "risk/utility" test should apply, largely because, according to him, this case involves a "second impact" analysis.

I agree with Tannebaum (for reasons other than that he relies upon) that the "risk/utility" test applies. Nevertheless, I reject Tannebaum's contention that he has generated a jury issue sufficient to avoid summary judgment simply by virtue of the fact that an admittedly fact-intensive balancing test furnishes the relevant legal standard.

■ In Maryland, in design defect cases based on the lack of a safety device whose absence does not create an "inherently unreasonable risk" of harm, the "risk/utility" balancing test is applied to determine whether the product, marketed without the safety device, is "unreasonably dangerous" so that the product is "defective." *Ziegler*, 74 Md.App. at 623, 539 A.2d. at 706. The ultimate question, for the jury if reasonable minds might draw divergent conclusions from the evidence, or for the court if only one reasonable conclusion is possible, is "whether a manufacturer, knowing the risk inherent in his product, acted reasonably in putting it on the market." *Pease v. American Cyanamid*, 795 F.Supp. 755, 758 n. 3 (D.Md.1992) (quoting *Singleton v. International Harvester Co.*, 685 F.2d 112, 115 (4th Cir.1981) (interpreting Maryland law)).

■ Application of the "risk/utility" test requires analysis of seven factors to determine "whether the product is unreasonably dangerous:"

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole;

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury it will cause;

(3) The availability of a substitute product which would meet the same need and not be as unsafe;

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility;

(5) The user's ability to avoid danger by the exercise of care in the use of the product;

(6) The user's anticipated awareness of the dangers inherent in the product and ability to avoid the dangers, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions;

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 759; *see generally Binakonsky v. Ford Motor Co.,* 133 F.3d 281, 285–89 (4th Cir.1998) ("crashworthiness" case applying Maryland law). Thus, Tannebaum's burden at this stage of the case is to project evidence sufficient to enable a reasonable juror to conclude from a dispassionate weighing of the seven above factors that the forklift was "unreasonably dangerous."

To be sure, the extant case law reflects the regrettable reality that industrial forklift accidents have been historically, *see generally* John S. Herbrand, Annotation, *Products liability: forklift trucks,* 95 A.L.R.3rd 541, 1979 WL 52325 (1979), and remain today a fertile field for the evolution of products liability law in the various states. *See Anderson v. Nissan Motor Co., Ltd.,* 139 F.3d 599 (8th Cir.1998) (applying Nebraska law); *Liriano v. Hobart Corp.,* 132 F.3d 124, 127 (2nd Cir.1998) (discussing *Lopez v. Precision Papers, Inc.,* 107 A.D.2d 667, 484 N.Y.S.2d 585 (2d Dep't 1985), *aff'd,* 67 N.Y.2d 871, 501 N.Y.S.2d 798, 492 N.E.2d 1214 (1986) (interpreting New York law)), *certified question adhered to,* 170 F.3d 264 (2nd Cir. 1999); *Batts v. Tow–Motor Forklift Co.,* 66 F.3rd 743 (5th Cir.1995) (applying Mississippi law); *Austin v. Clark Equipment Co.,* 48 F.3d 833 (4th Cir.1995) (applying Virginia law); *Habecker v. Clark Equipment Co.,* 36 F.3d 278 (3rd Cir.1994) (applying Pennsylvania law); *Francis v. Clark Equipment Co.,* 993 F.2d 545 (6th Cir.1993) (applying Ohio law). This case claims its uniqueness in the fact that it seems to be the first in which a plaintiff alleges that as a result of a defective design he was *ejected from a forklift that was not moving but was at rest.*

■ In any event, I have carefully considered the summary judgment record and I have probed the parties' opposing views, in light of the "risk/utility" test applicable to this case. I am persuaded that a reasonable fact finder could *not* conclude by a preponderance of the evidence here that the manufacturer acted unreasonably when it marketed a narrow-aisle forklift, accompanied by clear and adequate warnings and instructions as to its proper operation, without a wire mesh covering the operator's compartment or a rear door as standard equipment.

Such forklifts comply with all relevant OSHA regulations and ANSI requirements and there were not in 1983 and are not today any *established or recognized standards* requiring that a forklift be equipped with a wire mesh covering the overhead guard or rear door as standard equipment, even though such products are today readily available. Indeed, it is undisputed that the addition of a rear door to the type of forklift involved here would necessarily increase its size so that its functional utility in narrow-aisle environments would be measurably diminished. Most significantly, despite what appears to have been a vigorous campaign by Tannebaum's expert to persuade the professionals on the ANSI committee to do so, ANSI has *twice rejected the idea that a rear door be required as standard equipment on such forklifts.* This is compelling evidence, even if it is not conclusive evidence, that engineering professionals have assessed the risk of rearward ejectment from stand-up forklifts as not unreasonably high.

While the absence of a rear door obviously means that it is foreseeable that under certain circumstances an operator could be ejected from the forklift, this fact alone does not rationally support the view that the marginal increase in the risk of harm from being ejected is *unreasonable*. To the contrary, it is undisputed in the record that in some environments the presence of a rear door could *exacerbate* injury, e.g., by slowing an escape from a forklift falling off a dock (such as where Tannebaum operated the forklift), and especially, injuries to one operating the forklift, as the evidence suggests Tannebaum habitually operated it, by leaning back and out from under the overhead guard. Thus, Tannebaum's expert agrees that even if his view that rear doors should be standard equipment were ever to be accepted by ANSI and OSHA, there must also be offered "a delete option." Tannebaum has not undertaken to demonstrate why a "delete option" would not have been reasonable or desirable in this instance. Furthermore, although Tannebaum's expert has never operated a forklift with a wire mesh covering the overhead guard (which would be useful in handling small objects), there is no dispute that an operator's ability to view a load would be impeded to some extent by the use of an overhead guard having smaller openings, ironically increasing the likelihood that the operator would lean back and into harms's way.

It must be recalled, as well, that the plethora of warnings accompanying the forklift contributes very significantly to the dangerousness *vel non* of the forklift. The simple fact is that when the forklift is used in the manner in which it is intended to be used, and in accordance with the important instructions for safe use, the risk of harm from being ejected from a forklift standing at rest is absolutely *de minimis*, if any such risk exists at all. *Tannebaum specifically testified on deposition that if his employer had furnished him with the warnings which the manufacturer intended that he receive (including the inadvisa-*

*bility of unsecured "high loading"), he would have obeyed those warnings rather than his employer's instructions to the contrary.* See § 402A of the Restatement (Second) of Torts, cmt. j (1965) ("Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."). It is exceedingly rare in personal injury litigation to see such an admission wedded so comfortably to controlling legal doctrine as is the case here.

Thus, "risk/utility" factors (1), (2), (4), (5) and (6) weigh overwhelmingly in favor of the defendant in this case; factor (7) favors Tannebaum; factor (3) is essentially evenly balanced. Tannebaum, relying on his expert, an engineer who has battled with ANSI for many years in support of his opinion that rear doors should be made standard equipment, asserts that there is sufficient evidence in the record (i.e., his expert's opinion) establishing that there is an actionable design defect present in the subject forklift. He also points to the undisputed (and unremarkable) fact that today defendant markets stand-up forklifts with optional rear doors and wire mesh coverings.

Although I would admit much of the testimony of Tannebaum's expert and deny defendant's motion in limine, by the expert's own admission, some of the bases for his opinions are indeed farfetched and "non-scientific." *See* Sevart Dep. at 92. For example, the expert makes the altogether implausible contention that manufacturers do not genuinely believe that doors should not be standard equipment because if they did so believe, they would not make them available as optional equipment. *Id.* This is a non-sequitur.

The expert also testified that the credibility of the manufacturers' claim that doors on stand-up forklifts can pose significant safety hazards for operators is undermined because, if his opinion that doors

were minimally necessary gained acceptance, the manufacturers would be required to "retrofit" with rear doors the millions of existing forklifts without them, at a cost of $100 million. However, Tannebaum has not remotely supported this rank speculation with legal argument rooted in Maryland law or any other legal doctrine from any source. Overall, then, the probative value of plaintiffs' showing on the issue of the reasonableness of the risk to which Tannebaum was exposed by his use of the forklift at issue is thin, at best, rising barely to the level of a scintilla. This is not sufficient under Fed.R.Civ.P. 56, to withstand summary judgment.

Tannebaum also invites the court's attention to *Hopper v. Crown,* 646 So.2d 933 (La.App. 1st Cir.1994), *writ denied,* 651 So.2d 275 (1995), a case in which Tannebaum's expert also testified for the plaintiff that the absence of a rear door on a stand-up forklift made the product unreasonably dangerous and therefore defective. In *Hopper,* the plaintiff, operating a stand-up forklift similar to the product in the case at bar, collided with an overhead door in a warehouse, causing a concrete wall above the door to collapse. The force of the collision ejected the operator through the rear opening of the doorless forklift and he suffered severe injuries when a concrete beam which had been a component of the wall fell on him. He was awarded substantial damages in a non-jury trial in which design defect and failure to warn theories were presented and adjudicated in tandem. *Hopper* is clearly distinguishable on the facts and the law from the case at bar, and indeed it is no longer good law even in Louisiana.

The risk under assessment here is not the risk of a violent collision as in *Hopper;* it is an examination of the risk of harm from an ejectment from a forklift at rest, coupled with the use of the product ("high stacking" of potentially lethal unsecured loads) in contravention of clear and adequate warnings against such use, whose adequacy have not been cast into doubt.

Furthermore, under Louisiana's version of the "risk/utility" test as it existed at the time of *Hopper,* even if the utility of a product outweighed the risks inherent in its use, a plaintiff could recover simply by establishing a manufacturer's culpable "failure to adopt an alternative design," a legal standard which approaches extraordinarily close to *absolute,* rather than *strict,* liability. *See id.* at 944, n. 3 (noting that under the unamended Louisiana law applicable in *Hopper,* "in a failure to adopt an alternative design case, it is conceded that the utility outweighs the danger-in-fact, seemingly making a risk-utility or consumer expectation analysis superfluous."). This is a far cry from the legal standard applicable under Maryland law.

Moreover, the Louisiana legislature acted promptly to abrogate that state's Supreme Court's "broad, liberal view" of products liability law. *See Halphen v. Johns–Manville Sales Corp.,* 737 F.2d 462, 466 (5th Cir.1984), *opinion withdrawn and question certified,* 752 F.2d 124 (5th Cir. 1985), *certified question answered,* 484 So.2d 110 (La.1986), *certified question conformed to,* 788 F.2d 274 (5th Cir.1986). Louisiana's 1988 products liability statute, adopted in response to *Halphen,* more closely tracks Maryland law. *Cf.* La.Rev. Stat.Ann. § 2800.56 (West 1999) ("A product is unreasonably dangerous in design if . . .: (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; *and* (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. *An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.*") (emphases added); *and see* Vargo, *supra,* 26 U.Mem.L.Rev. at 692 ("The

Louisiana legislature enacted the 'Louisiana Products Liability Act,' which became effective September 1, 1988. The Act eliminated the *Halphen* decision and set forth numerous barriers to a consumer's products liability action. The overall effect of the Louisiana Act has been described as a return to negligence by those favoring the Act. But, in reality, the Act is so anti-consumer that it places burdens on the plaintiff beyond those required under a negligence system.... This new risk-utility balancing formula under the Louisiana Act completely destroys strict liability law."). Accordingly, *Hopper* provides no precedential value in the case at bar.

In sum, for the reasons already expressed, I am persuaded that defendant is entitled to judgment as a matter of law in this case. Tannebaum's insistence that the application of the "risk/utility" test necessarily generates genuine disputes of material fact precluding summary judgment is misplaced. State and federal courts applying Maryland's "risk/utility" test have not hesitated to grant summary judgment (pre-trial) or judgment as a matter of law (during and after trial) in appropriate cases, notwithstanding the objective, often fact-bound quality of the test. What Judge Motz said in a strict liability case involving a pharmaceutical has application to the case at bar:

> Plaintiff contends that the proffered testimony of her experts create genuine disputes of material fact.... The fallacy in this contention is that what is material to the legal issue, as properly framed, is the fact that, assuming a genuine dispute between experts exists, there is a substantial body of expert opinion, supported by extensive studies conducted by independent professionals, that the [challenged product] is at least as safe and efficacious as [the alternative urged by plaintiff's expert]. To state this proposition is not to attempt to resolve the underlying scientific dispute. It merely is to recognize that in a case such as this the legal issue and the

scientific question are not the same. Of course, the law can—and must—require manufacturers to foster and pay heed to the development of scientific knowledge. *See Westinghouse Electric Corp. v. Nutt,* 407 A.2d 606, 611 (D.C.App.1979) (manufacturer must keep abreast and informed of developments in his field). *However, where there is a genuine disagreement on a particular question and where the weight of scientific knowledge supports the judgment reached by a manufacturer who is marketing a socially desirable product, the law cannot permit a jury merely to substitute its own judgment that another product, preferred by plaintiff's experts, would be better. Were it to do so, the law itself would be "inherently unreasonable," presenting manufacturers with a choice between Scylla and Charybdis.*

*Pease,* 795 F.Supp. at 759 (emphasis added).

This reasoning is sound and foreshadows the outcome here. In the case at bar, at bottom, Tannebaum's engineering expert seeks simply to transfer his professional dispute with ANSI and OSHA over the desirability of requiring rear doors on narrow-aisle stand-up forklifts from the laboratory and meeting room into a courtroom. This is not a sufficient basis to permit "the jury's whim" to resolve the question presented. *Id.* at 760. As a matter of law, under a proper application of the "risk/utility" test *to the record evidence here,* including the myriad warnings and instructions as to the proper operation of the forklift which accompanied the product's delivery to the original purchaser, the manufacturer did not act unreasonably in marketing a narrow-aisle stand-up forklift without a rear door or overhead wire mesh, and the product is not, therefore, "unreasonably dangerous" so as to be "defective" under Maryland law. Any other conclusion *on the present record* would be irrational.

(iv)

For the reasons set forth, defendant is entitled to judgment as a matter of law. This conclusion makes it unnecessary to consider the remaining grounds asserted by defendant in support of its motion for summary judgment, including Tannebaum's employer's alleged "substantial alteration" of the forklift (by failing to provide the critical warnings), and the affirmative defenses of "sophisticated user" and "product misuse," each of which would appear to present jury questions. An order follows.

### ORDER

In accordance with the foregoing memorandum, it is this 16th day of March, 1999, by the United States District Court for the District of Maryland,

(1) ORDERED that the Defendant's Motion for Summary Judgment is GRANTED and judgment is hereby entered in favor of Defendant; and it is further

(2) ORDERED that the Clerk of the Court CLOSE this case and TRANSMIT copies of this order and the foregoing memorandum to the attorneys of record.