Allison A. MURPHY, a Minor, By Rita
and John MURPHY, As Parents
and Next Friends,

and

Rita and John Murphy, Individually,
Plaintiffs,

v.

PLAYTEX FAMILY PRODUCTS
CORPORATION, Defendant.

No. AMD 00–3664.

United States District Court,
D. Maryland.

Dec. 19, 2001.

Gregory R. Smouse, Law Office, Towson, MD, for plaintiffs.

Terrence Mark Ranko Zic, Law Office, William H. Robinson, Jr., Wright Robinson Osthimer and Tatum, Washington, DC, for defendant.

## MEMORANDUM

DAVIS, District Judge.

This is a products liability case arising under Maryland law, here on diversity, in which Allison A. Murphy ("Murphy") and her parents, Rita and John Murphy (collectively "plaintiffs")[1] allege that Murphy suffered toxic shock syndrome ("TSS") in January 1998 from her use of Playtex tampons. Defendant is Playtex Products, Inc.[2] ("defendant"), the manufacturer of Playtex tampons. Plaintiffs allege claims for negligence, strict liability, violation of the Maryland Consumer Protection Act, breach of express warranty, breach of implied warranty and restitution. Murphy also seeks punitive damages. Now pending is defendant's motion for summary judgment on all claims. I have given careful attention to the parties' memoranda and exhibits and a hearing is not needed. Local R. 105.6. For the reasons explained below, I shall grant defendant's motion for summary judgment on all claims.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A

fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to

1. Murphy was a minor when the complaint was filed on December 18, 2000. She was born on November 1, 1983. *Complaint* ¶ 2.

2. Defendant, in its motion for summary judgment, notes that plaintiffs have sued it im-

properly under the name of Playtex Family Products Corporation and that the proper nomenclature is Playtex Products, Inc. *Mem. in Support of Def.'s Mot. for Summ. J.* at 1.

trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

(ii)

I shall turn now to the merits of the motions for summary judgment. I view the facts in the light most favorable to plaintiffs, the non-movants.

Murphy contracted TSS in January 1998 as a result of using Playtex Super Absorbency tampons. *Complaint* ¶¶ 3–7. TSS is a rare, but potentially serious disease. *Aff. of Dr. Irwin Butensky* ¶ 3 (hereinafter *Butensky Aff.*). This condition is believed to be caused by a toxin or toxins produced by certain strains of *Staphylococcus aureus* ("staph.aureus") bacteria. *Id.* The toxin most commonly associated with menstrual TSS is known as toxic shock syndrome toxin–1 ("TSST–1"). *Id.*

Plaintiffs have designated Philip M. Tierno, Ph.D., and Bruce A. Hanna, Ph.D., as expert witnesses with respect to plaintiffs' design defect claim. *Pls.' Expert Witness Disclosure Statement.* Drs. Tierno and Hanna are microbiologists who have collaborated in research. *Id.* These witnesses are expected to testify (based, in part, upon their unblinded tube experiments) that the Playtex tampons used by Murphy were defectively designed because they were manufactured with rayon fiber instead of cotton fiber. *Id.* In their opinion, tampons made with cotton fiber present less of a risk of tampon-associated TSS than tampons made with rayon fiber. *Id.* More specifically, the witnesses claim:

> Our data shows that all-cotton tampons, whether washed or unwashed, caused no detectable TSST–1 toxin to be produced as compared to the synthetic non-all-cotton tampons. This difference in toxin production was likely due to the fact that cotton provides fewer phsyicochemical factors that favor TSST–1 production .... Cotton is less absorbent, has less surface area, does not effectively concentrate protein in aqueous solutions, and provides less viscous environment compared with all of the synthetics that were used in tampon manufacture ... or that still are used in tampon manufacture (viscose rayon). That tampon that Ms. Murphy was using when she became ill was a Playtex tampon made of viscose rayon.

*Id.* (citations omitted).

Plaintiffs' witnesses, however, have conceded that tampon-associated TSS will occur regardless of what fiber is used, even if all cotton tampons are used. *Dep. Test. of Philip M. Tierno,* Kaminski v. Kimberly–Clark Corp., No. 93NP, p.250 (Mich. Cir. Ct.-Kent County, August 18, 1995). They have also conceded that they do not know of any other scientist that shares their opinion regarding the purported advantages of cotton fiber over rayon fiber in the manufacture of tampons.[3] *Dep. Test.*

---

**3.** The deposition states as follows:

> [Tierno]: I don't know any of the research that is current, and I don't know how much research there is looking at fibers, but I don't recall gleaning any information from any of the sources that you usually glean information from that would support that or even explore it or even care about pursuing it.
> Q: So the answer to my question is that you don't know of any other researchers since 1985 that are microbiologists that have come to the conclusion that the type

of fiber is a primary factor in the risk of Toxic Shock Syndrome other than you and Dr. Hanna; isn't that correct?
> [Tierno]: the answer is yes, comma, with what I said preceding that question.

*Dep. Test. of Philip M. Tierno,* Johnson v. Tambrands, Inc., No. 4–92–80034, p. 261 (S.D.Iowa, March 19, 1994). Plaintiffs' witness, Tierno, states that defendant has taken this quotation out of context by not providing the preceding two or three pages. *Aff. of Philip M. Tierno, Jr., Ph.D.* ¶ 13. However,

of *Philip M. Tierno,* Johnson v. Tambrands, Inc., No. 4–92–80034, p. 261 (S.D.Iowa, March 19, 1994). Plaintiffs' witnesses have also stated that their work remains to be verified by *in vivo* and epidemiological work. *Dep. Test. of Philip M. Tierno,* Haddix v. Playtex, No. 9302004, pp. 198–99 (C.D.Ill., January 28, 1995); Tierno & Hanna, *Propensity of Tampons and Barrier Contraceptives to Amplify Staphylococcus Aureus Toxic Shock Syndrome Toxin 1,* 2 Infectious Diseases In Obstetrics & Gynecology 140, 144 (1994).

Published peer-reviewed scientific studies conducted by independent scientists, other than plaintiffs' witnesses, indicate that no greater quantity of TSST–1 is produced in the presence of rayon fiber tampons than cotton fiber tampons in laboratory and animal tests. *Butensky Aff.* ¶ 12. The first published work to address the relationship of tampon fiber to the production of TSST–1 concluded in 1984 that tampon fibers, including rayon fiber, did not provide nutrients for growth of TSS staph. aureus or factors that induce production of TSST–1. *Id.* ¶ 13 (referring to Schilievert, et. al., *Toxic Shock Syndrome Staphylococcus Aureus: Effect of Tampon on Toxic Shock Syndrome Toxin 1 Production,* 64 Obstetrics & Gynecology 666, 670 (1984)). This finding regarding rayon fiber has been echoed in other published, peer-reviewed scientific studies since then, including 1989 articles reporting on separate studies authored by Playtex's experts, Dr. Fischetti (*in vitro* testing) and Dr. Melish (*in vivo* (animal) testing). *Id.* ¶ 14

(citations omitted). These findings have been further corroborated by subsequent studies. *Id.* ¶ 15.

The United States Food and Drug Administration ("FDA") has promulgated mandatory device specific regulations that address the distribution of tampons in light of the reported risk of TSS. These regulations are applicable to all tampon manufacturers, including manufacturers of all-cotton tampons. 21 C.F.R. § 801.430 (2000) (Def.'s Ex. 7). Only months after the publication of the first data suggesting a possible statistical link between tampon use and menstrual TSS, the FDA, in October 1980, issued proposed regulations requiring tampon manufacturers to provide warnings about the risk of TSS.[4] 45 Fed. Reg. 69840 (1980) (Def.'s Ex. 8). Playtex began placing voluntary TSS warnings on and in its tampon packages in the fall of 1980. *Butensky Aff.* ¶ 4.

During the comment periods on the proposed regulations, the FDA "particularly invit[ed] comments" relating to its proposed warnings, but specifically stated that the "FDA invites comments on all aspects of TSS and its relationship with tampons . . . ." 46 Fed.Reg. 23766, 23768 (1981) (Def.'s Ex. 9). The FDA received more than 300 comments from consumers, manufacturers, government health departments, consumer organizations, and industry organizations. 47 Fed.Reg. 26982 (Def.'s Ex. 10). In June 1982, the FDA issued its final regulations that required that all tampon manufacturers provide

---

neither plaintiffs nor defendant provide these preceding pages.

4. The summary of this regulation states:

The . . . FDA is issuing a proposed rule which, if adopted, would require a statement in the labeling of menstrual tampons warning users that toxic shock syndrome (TSS), a rare but serious and sometimes fatal disease, is associated

with the use of tampons. The proposed warning statement would advise tampon users how they could almost entirely eliminate or greatly reduce the risk of TSS. The proposed warning statement would also advise tampon users of steps to take if the symptoms of the disease appear.

45 Fed.Reg. 69840 (1980) (Def.'s Ex. 8).

specific warnings about TSS. *Id.* at 26982, 26990. These regulations became effective December 20, 1982. *Id.* at 26982. It was at this time, 1982, that Playtex stopped providing its voluntary TSS warnings and began complying with federally mandated warning requirements regarding tampon use and TSS. *Butensky Aff.* ¶ 4.

The FDA specifically considered and rejected a comment urging reclassification of tampons as Class III devices rather than Class II devices.[5] 47 Fed.Reg. at 26988–89. In rejecting this comment, the FDA noted that "TSS is a rare disease" and determined that "it cannot be said that tampons, in and of themselves, present a potentially unreasonable risk to health." *Id.* The FDA further stated that none of the data available to it demonstrated "an association between the occurrence of TSS and (1) a particular tampon fiber, ingredient, or combination of ingredients ... or (2) any other product characteristic, including tampon materials, construction design, or the manner in which the device functions ...." *Id.* at 26984. When it issued its tampon regulations in 1982, the FDA committed itself to continued monitoring of the incidence of TSS and avowed that "if new information is presented to warrant a change, [the FDA] will propose to modify or revoke regulation." *Id.* at 26989.

In 1988, the FDA proposed amendments to its tampon regulations regarding package labeling relating to the range of absorbency of the tampons. 53 Fed.Reg. 37250 (1988) (Def.'s Ex. 12). In October 1989, after receiving more than 270 comments, the FDA issued a final ruling amending its tampon regulations to continue to require that all tampon manufactures provide specific warnings concerning TSS (including the advice not to use tampons at all if a woman desired to avoid the reported risks of tampon-associated TSS and to use the minimum absorbency needed to control menstrual flow if she did decide to use tampons), but also imposed requirements standardizing tampon absorbency and absorbency designations ("Junior," "Regular," "Super," and "Super Plus") to assist consumers in selecting tampons. 54 Fed. Reg. 25076 (1989) (Def.'s Ex. 13); 54 Fed. Reg. 43766 (1989) (Def.'s Ex. 14). These changes became effective March 1, 1990. 54 Fed.Reg. at 43766. The FDA's tampon regulations have not been amended since 1989. *Compare* 21 C.F.R. § 801.430 (1990) (Def.'s Ex. 15), *with* 21 C.F.R. § 801.430 (2000) (Def.'s Ex. 7).

During its review of tampon regulations in 1988 and 1989, the FDA concluded once again that "none of the comments favoring ingredient labeling cited, discussed, or submitted any data showing an association between any particular ingredient and any risk to health, including allergic reaction, sensitivity or irritation, and the FDA is unaware of any such data." 54 Fed.Reg. at 43769. Defendant notes that this conclusion has been reinforced by the United States Centers for Disease Control and Prevention ("CDC"), which has concluded that it could not detect an influence of "chemical composition (characterized ei-

---

5. The FDA classifies medical devices intended for human use into one of three classes based upon the degree of regulation necessary to ensure a device's safety and effectiveness. 21 U.S.C. § 360c (1999). Class I devices are those that present little or no risk to human health and safety and that are subject only to general manufacturing controls. *Id.* § 360c(a)(1)(A). Class II devices pose a slightly greater risk to human health and are therefore subject to stricter FDA controls. *Id.* § 360c(a)(1)(B). Class III devices include those devices that pose "potentially unreasonable risk[s] or illness or injury." *Id.* § 360c(1)(C). Tampons have been classified as Class II medical devices. 21 C.F.R. §§ 884.5460, 884.5470 (2000) (Def.'s Ex. 11).

ther as the presence or absence of a given material or as a percentage comparison by weight) on the risk of menstrual TSS." *Mem. in Support of Def.'s Mot. for Summ. J.* at 6 (internal quotation marks omitted) (quoting Reingold, et. al., *Risk Factors for Menstrual Toxic Shock Syndrome: Results of a Multistate Case–Control Study*, 11 REVIEWS OF INFECTIOUS DISEASE S35, S38 (Supp.1, Jan.-Feb.1989) (Def.'s Ex. 16)). The FDA reiterated this finding in late 1998 and early 1999 in response to rumors on the Internet that claimed that rayon fibers in tampons cause toxic shock syndrome. FDA Release, *Tampons and Asbestos, Dioxin, & Toxic Shock Syndrome* (updated February 22, 1999) (Def.'s Ex. 17). The FDA stated that "rayon tampons do not appear to have a higher risk of TSS than cotton tampons of similar absorbency."[6] *Id.*

From January 1987 through and including January 1998, Playtex placed the following alert statement, called for by FDA regulations governing tampons, in three separate locations on the outside of each box of Playtex tampons shipped from Playtex's manufacturing facility:

> ATTENTION: Tampons are associated with Toxic Shock Syndrome (TSS). TSS is a rare but serious disease that may cause death. Read and save the enclosed information.

*Butensky Aff.* ¶ 5, Ex. A. Playtex placed this alert statement on the large panel devoted to product information, on the end of the box where the purchaser is directed to open, and on the opposite glued end. *Id.*

In accordance with the amendments to FDA tampon regulations that became effective March 1, 1990, from early 1990 through and including 1998, each package of Playtex tampons bore one of the standardized terms of absorbency identified in the amendments to the regulations, *supra. Id.* ¶ 6. On the outside of each package of Playtex tampons, Playtex included the standardized term of absorbency applicable to that package as measured by the test required in 21 C.F.R. § 801.430(f), *supra. Id.* ¶ 6, Ex. A. The standardized term appeared on the front of the box and on four other sides of the box. *Id.* ¶ 6. Each time the absorbency term appeared, it was placed in an individual, highlighted box. *Id.*

Playtex also included on the outside of each package the range of absorbency corresponding to the applicable standardized term. *Id.* Playtex further explained, with the use of a chart, that its tampons were available in three ranges of absorbency— regular, super, and superplus, explained

---

**6.** More specifically, the FDA release states:
There are also allegations that rayon in tampons causes TSS, and dryness or ulcerations of vaginal tissues. TSS is a rare but potentially fatal disease caused by a bacterial toxin. Approximately half the cases of TSS reported today are associated with tampon use during menstruation, usually in young women. TSS also occurs in children, men, and non-menstruating women, frequently in connection with wounds. The number of reported TSS cases has decreased significantly in recent years. In 1997, only five confirmed menstrually-related TSS cases were reported, compared with a high of 814 cases in 1980 [according to data from the Centers for Disease Control and Prevention ("CDC")]. Though scientists recognize an association between TSS incidence and tampon use, the exact connection remains unclear. Research conducted by the CDC suggested that use of some high absorbency tampons increased the risk of TSS in menstruating women. However, rayon tampons do not appear to have a higher risk of TSS than cotton tampons of similar absorbency.
FDA Release, *Tampons and Asbestos, Dioxin, & Toxic Shock Syndrome* (updated February 22, 1999) (Def.'s Ex. 17).

what the ranges of absorbency were, and identified the absorbency term corresponding to each range. *Id.* Playtex then told consumers that "[e]ach absorbency range represents the grams of fluid that can be absorbed by all manufacturer's tampons based upon a standardized laboratory test," to "[u]se this chart to compare the absorbencies of Playtex Tampons to other brands," and to "[s]**elect the minimum absorbency needed to control your menstrual flow in order to reduce the risk of getting TSS.**" *Id.* (boldface in original).

Since before January 1998, Playtex's specifications have required that a package insert warning of the TSS risk associated with tampon use be included in all boxes of Playtex tampons packed at Playtex's manufacturing facility. *Id.* ¶ 7. From January 1987 through and including January 1998, Playtex's package insert concerning TSS included a bold face block that is printed in red and that reads as follows:

WARNING

Important Information

About Toxic Shock

Syndrome (TSS).

*Id.* ¶ 8, Ex. B. This package insert was folded and bridged across the top of the tampons so that the "WARNING" block would be the first part of the insert that a purchaser would see when she opened the box in accordance with its directions. *Id.* ¶ 9, Ex. C.

Since before January 1998, the text of the warnings in Playtex's package insert contained the following information with respect to each of the subjects specified by the FDA warning requirements. *Id.* ¶ 10. The warnings stated:

**WARNING SIGNS: WARNING SIGNS OF TSS FOR EXAMPLE ARE: SUDDEN FEVER (USUALLY 102° OR MORE), VOMITING, DIARRHEA, FAINTING OR NEAR FAINTING WHEN STANDING UP, DIZZINESS, OR A RASH THAT LOOKS LIKE A SUNBURN.**

**IF THESE SIGNS OR OTHER SIGNS OF TSS APPEAR, YOU SHOULD REMOVE THE TAMPON AT ONCE, DISCONTINUE USE, AND SEE YOUR DOCTOR IMMEDIATELY.**

\* \* \* \* \* \*

There is a risk of TSS to all women using tampons during their menstrual period. TSS is a rare but serious disease that may cause death. There are scientific studies that have concluded that tampons contribute to the cause of TSS.

The reported risks are higher to women under 30 years of age and teenage girls. The incidence of TSS is estimated to be between 1 and 17 cases of TSS per 100,000 menstruating women and girls per year.

You can avoid any possible risk of getting tampon-associated TSS by not using tampons.

There are scientific studies which have concluded that higher absorbency tampons increase the risk of TSS. . . .

Playtex tampons are available in three ranges of absorbencies: Regular Absorbency (6–9 grams), Super Absorbency (9–12 grams) and Super Plus Absorbency (12–15 grams).

Each range represents the grams of fluid that can be absorbed by all manufacturers' tampons based on a standardized laboratory test. Use this information to compare the absorbencies of these tampons to other brands.

Select the minimum absorbency needed to control your menstrual flow in order to reduce the risk of getting TSS.

A scientific study has concluded that the risk of TSS is increased if you use tampons continuously during your menstrual period. You can reduce the risk of getting TSS during your period by alternating tampon use with feminine pads. If you have had warning signs of TSS in the past, you should check with your doctor before using tampons again. If you have any questions about TSS or tampon use, you should check with your doctor.

*Id.* (boldface in original). The FDA has not found Playtex's tampon packaging or labeling to be noncompliant with the mandatory federal TSS warning requirements. *Id.* ¶ 11.

Murphy testified that she read the TSS alert statement on the outside of the Playtex tampon packages prior to her illness in January 1998. *Dep. Test. of Allison Murphy* at 20–21 (Def.'s Ex. 18). She was aware prior to her illness of the reported risk to all women of TSS from tampon use. *Id.* at 22. Murphy also read Playtex's package insert prior to her illness and acknowledged that the TSS insert was in every box of Playtex tampons. *Id.* at 17–18. She went over the insert with her mother, a nurse, prior to her illness. *Id.* at 16. Murphy was further aware that Playtex tampons were available in different absorbencies. *Id.* at 15. Murphy followed the TSS warnings accompanying Playtex tampons by using the minimum absorbency necessary for her menstrual

flow and by alternating tampon use with menstrual pad use. *Id.* at 14–15.

(iii)

Analysis of the pending motion demonstrates that defendant is entitled to summary judgment as to all claims on myriad grounds.

*Preemption of Failure to Warn Claims*

Defendant argues that plaintiffs' inadequate warning claims are expressly preempted by the Federal regulations governing tampon labeling. Specifically, defendant claims that the Medical Device Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 360k(a)[7] preempt state requirements different from or in addition to Federal requirements for tampons. Plaintiffs, in their opposition, state that as "this Court has addressed this issue previously in *Sloman v. Tambrands, Inc.,* 841 F.Supp. 699 (D.Md.1993), the Plaintiffs will not brief this issue further." *Pls.' Mem. of Law in Response to Df's. Mot. for Summ. J.* at 3. Accordingly, it appears that plaintiffs have conceded the issue of preemption. However, plaintiffs do note that defendant is not arguing that plaintiffs' remaining claims are preempted. Although the preemption claim has been conceded by plaintiffs, I will discuss preemption briefly.

The doctrine of preemption is based on the Supremacy Clause of the United States Constitution.[8] *Duvall v. Bristol–Myers–Squibb Co.,* 103 F.3d 324,

---

7. 21 U.S.C. § 360k(a) states in pertinent part:
[N]o State . . . may establish or continue in effect with respect to a device intended for human use in any requirement-
(1) which is different from, or in addition to, any requirement available under this chapter to the device, and
(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

8. The Supremacy Clause of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

328 (4th Cir.1996). Preemption is the standard by which a state law is invalid to the extent that it conflicts with federal legislation. *Id.* The Fourth Circuit has explained that preemption occurs in several situations:

> [S]tate law is preempted when Congress expressly so provides ...; when federal regulation of a legislative field is so comprehensive that there is no room for supplementary state regulation ...; or when the state law is in actual conflict with a federal provision ....

*Id.* (internal citations omitted).

It is clear that the tampon labeling regulation promulgated by the FDA expressly preempts plaintiffs' state law failure to warn claims. *Sloman,* 841 F.Supp. at 701 & n. 2 (citing 17 cases that held that the federal labeling requirements for tampons preempt state law warning claims). The court in *Sloman* explained:

> Tampons are regulated as medical devices by the 1976 Medical Device Amendments, (21 U.S.C. § 360c) to the Federal Food, Drug & Cosmetics Act of 1938, which expressly preempts any different or additional state regulation of medical devices, including label regulations. The Amendments and the regulations, specifically 21 C.F.R. § 801.430, expressly confer upon the FDA the exclusive authority to establish labeling standards for tampons.

*Id.* at 701 (internal footnotes omitted) (citing, in footnotes, 21 U.S.C. § 360k and 21 C.F.R. § 801.430 in their entirety).

Thus, plaintiffs' failure to warn claims, including plaintiffs' Consumer Protection Act claim,[9] are expressly preempted by the requirements of 21 C.F.R. § 801.430, *supra. Id.* at 701. Consequently, plaintiffs' failure to warn claims, regardless of how they are styled or plead, are preempted as they seek to impose state law requirements upon Playtex that are "different from, or in addition to," the TSS warning requirements imposed by 21 C.F.R. § 801.430. Defendant also demonstrates that it has complied with the FDA's requirements and thus with any identical state law requirements. *Mem. in Support of Df's. Mot. for Summ. J.* at 16–23. It appears that defendant makes this argument as the *Sloman* court explained that summary judgment "is not automatically

---

**9.** Plaintiffs argue that defendant has violated § 13–303 of the Maryland Consumer Protection Act by engaging in unfair and deceptive trade practices as defined in § 13–301(1), in pertinent part, "by making false and misleading written statements on their product packaging that had the capacity, tendency, or effect of deceiving or misleading Maryland consumers." *Pls.' Mem. of Law in Response to Def.'s Mot. for Summ. J.* at 15. Plaintiffs further argue that defendant has violated the Act by engaging in unfair or deceptive trade practices as defined in § 13–301(3) "by failing to state material facts, the omission of which deceived or tended to deceive." *Id.* Lastly, plaintiffs contend that defendant violated the Act by engaging in unfair or deceptive trade practices as defined in § 13–301(9) "through their deception, fraud, misrepresentations, and knowing concealment, suppression, and omission of material facts with the intent to that Maryland consumers rely upon the same in connection with the promotion or sale of tampon products." *Id.*

Defendant argues in its motion for summary judgment that summary judgment should be granted for defendant on this claim because (1) plaintiffs' design defect allegations are not actionable under the Consumer Protection Act, and (2) the remaining allegations are nothing more than failure to warn claims. Plaintiffs, in their opposition to summary judgment, do not address either of these arguments. Thus, it appears that they are conceding that defendant is correct. Regardless, to the extent that plaintiffs' Consumer Protection Act claim is a disguised defective design claim it is not actionable under the Act. *Cf. Sacks v. Philip Morris, Inc.,* 1996 WL 780311 (D.Md.1996). Otherwise, this claim amounts to a failure to warn claim, which has been preempted.

granted when federal law preempts state claims" and that the defendant must "demonstrate that, as a matter of law, its labels and inserts complied with the appropriate federal regulation for tampon safety warnings" required by 21 C.F.R. § 801.430. *Sloman*, 841 F.Supp. at 702. However, plaintiffs do not dispute that defendant has complied with the appropriate federal regulation for tampon safety warnings, hence, I will consider this issue conceded in favor of defendant.

*Strict Liability*

■ Plaintiffs properly point out that although defendant asserts that those claims based on a failure to warn are preempted, defendant does not argue that plaintiffs' remaining claims are subject to preemption. Design defect claims against tampon manufacturers are not preempted by the FDA's actions in regulating package labels and warnings, and in standardizing absorbency ratings. *See, e.g., National Bank of Commerce of El Dorado v. Kimberly–Clark Corp.*, 38 F.3d 988, 997 (8th Cir.1994); *Moore v. Kimberly–Clark Corp.*, 867 F.2d 243, 244 (5th Cir.1989).

■ Plaintiffs allege that defendant's tampons have a design defect because they are composed of a highly absorbent viscose rayon, and as such defendant is strictly liable to plaintiffs. To recover on a theory of strict liability in Maryland, plaintiffs must establish the following:

(1) the plaintiff was the user or consumer of an alleged defective product;

(2) the defendant was the seller of the product and at the time of sale was engaged in the business of selling such a product;

(3) at the time of sale the product was defective;

(4) the product reached the plaintiff without substantial change in the condition in which it was sold;

(5) the defect made the product unreasonably dangerous to the plaintiff; and

(6) the defect proximately caused plaintiff's injuries.

*See Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955, 959 (1976); Restatement (Second) of Torts § 402A (1965). A product defect, which renders the product unreasonably dangerous, might arise from the design of the product, a deficiency in its manufacture, or from the absence or inadequacy of any instructions or warnings as to its safe and appropriate use. *Simpson v. Standard Container Co.*, 72 Md.App. 199, 527 A.2d 1337, 1339–40 (1987), *cert. denied*, 311 Md. 286, 533 A.2d 1308 (1987). Again, this case is not concerned with a failure to warn. A negligence theory of products liability (discussed *infra*), in contrast, focuses upon the reasonableness of the manufacturer's acts and omissions, including the reasonableness of any warning (not at issue here), rather than upon the existence of a defect in the product itself. *Phipps*, 363 A.2d at 958. "The elements of proof are the same whether the claim [is] characterized as one for strict liability or negligence ... or breach of warranty." *Watson v. Sunbeam Corp.*, 816 F.Supp. 384, 387 n. 3 (D.Md.1993) (internal citations omitted); *see Ford Motor Co. v. General Accident Ins. Co.*, 365 Md. 321, 779 A.2d 362, 369 (2001); *Jensen v. American Motors*, 50 Md.App. 226, 437 A.2d 242, 247 (1981).

■ Design defect cases involve a determination of "whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." *Ziegler v. Kawasaki Heavy Indus., Ltd.*, 74 Md.App. 613, 539 A.2d 701, 705 (1988), *cert. denied*, 313 Md. 32, 542 A.2d 858 (1988). Plaintiffs must show that the tampon, as presently designed, was both "in a defective condition and unreasonably

dangerous" when it left the manufacturer. *Id.* at 704.

In determining defective conditions, Maryland courts have applied both the risk/utility test and the consumer expectation theory.[10] *Id.* at 704–07; *Tannebaum v. Yale Materials Handling Corp.*, 38 F.Supp.2d 425, 430 (D.Md.1999) (citing *Ziegler*, 539 A.2d at 704–07). *But see Singleton v. Manitowoc Co., Inc.*, 727 F.Supp. 217, 221 (D.Md.1989), *aff'd* 931 F.2d 887 (4th Cir.1991) ("If it is concluded that a design defect existed at the time of sale, the analysis would then of necessity turn to the issue whether the defect created an unreasonable danger. That analysis requires a weighing of the utility of risk inherent in the design against the magnitude of the risk.").

 "The ... risk/utility theory ... focuses on whether the benefits of a product outweigh the dangers of the design [while] ... the consumer expectation theory ... focuses on what a buyer/user of a product would properly expect that the product would be suited for ...." *Tannebaum*, 38 F.Supp.2d at 430 (internal quotation marks omitted) (citations and footnotes omitted) (quoting *Castro v. QVC Network, Inc.*, 139 F.3d 114, 116–17 (2nd Cir.1998)). Moreover, the "plaintiff must produce evidence upon which a jury could determine the manufacturer's reasonableness in marketing the product, and that this must amount to more than mere criticism of the existing design." *Johnson*, 702 F.2d at 494.

Defendant argues that under either test—consumer expectation or risk/utility—Playtex is entitled to summary judgment. Plaintiffs maintain that their claims survive summary judgment under both tests. I will discuss both the consumer expectation and risk/utility test.

*Consumer Expectation Test*

 Under the consumer expectation test, an unreasonably dangerous product is one which is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases [the product], with the ordinary knowledge common to the community as to its characteristics," and a defective condition means that "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Phipps*, 363 A.2d at 959. Defendant argues that plaintiffs' strict liability design defect claims fail under the consumer expectation test because plaintiffs cannot establish that Playtex tampons are more dangerous than would be contemplated by the ordinary consumer. Plaintiffs argue that defendant's rayon-component tampon satisfies the consumer expectation test as an unreasonably dangerous product because it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics." *Pls.' Mem. of Law in Response to Def.'s Mot. for Summ. J.* at 4 (internal quotation

---

**10.** One author has noted:

> It would appear that Maryland law, as defined by its highest court, applies ... the consumer expectation test ... to design defects; however, should such a test prove inappropriate, the consumer can use the risk-utility test as a viable alternative. The development of this dual standard by Maryland's highest court is based, to a great extent, on its concern

> that consumers should not be confronted with the almost impossible burden in proving negligence.

John F. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Design Defects—A Survey of the States Reveals a Different Weave*, 26 U. Mem. L. Rev. 493, 707 (1996) (internal footnotes omitted).

marks omitted) (quoting *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348, 353 (1985)). I agree with defendant.

The Seventh and the Ninth Circuits have reached similar conclusions.[11] The Ninth Circuit, in *Papike v. Tambrands Inc.*, 107 F.3d 737 (9th Cir.1997), held that the district court properly dismissed the plaintiffs' design defect, negligence, breach of warranty, and punitive damage claims and correctly determined that the plaintiffs' state law claim for failure to warn of the risk of TSS related to tampon use is preempted by 21 U.S.C. § 360k(a). *Id.* at 738. The Ninth Circuit affirmed the district court's grant of summary judgment to the defendant. *Id.*

As for the strict liability claim based on a theory of design defect, the plaintiffs argued that "Tampax tampons are defective because they contain viscose rayon." *Id.* The district court determined that the design defect claim should be dismissed because it failed both the consumer expectation test and the risk/utility test under California law. *Id.* In so determining, the district court "concluded that the affidavit of Dr. Tierno, a microbiologist who has conducted TSS-related testing of tampons, failed to raise an issue of triable fact concerning a casual connection between Tampax Original Regular tampons and TSS." *Id.* On appeal, the Ninth Circuit concluded:

> Tambrands' warnings met the federal requirements and [Plaintiff's] design defect claim therefore fails the "consumer expectation" test. To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate.

*Id.* at 743.[12]

The Seventh Circuit, in *Haddix v. Playtex Family Products Corp.*, 138 F.3d 681,

**11.** In an unpublished opinion, the district court for the Northern District of California also reached a similar decision. *See Nanut v. Kimberly–Clark Corp.*, 1994 WL 570561 at *3 (N.D.Cal. Oct.12, 1994), *aff'd*, 89 F.3d 846 (9th Cir.1996). Plaintiffs argue that I should disregard the Ninth and Seventh Circuit cases as they "turn on a quite detailed analysis of state products liability law, *Haddix* involving Illinois law and *Nanut* involving California law, both of which are distinct from Maryland law concerning products liability." *Pls.' Mem. of Law in Response to Def.'s Mot. for Summ. J.* at 6. Though there may be differences among Maryland, California and Illinois products liability law, I discern no difference so great as to alter the relevant analysis and plaintiffs do not point to any particular distinction among the three State's laws to warrant further inquiry.

**12.** This reasoning has been viewed favorably in other jurisdictions. *See, e.g., Lescs v. Dow Chemical Co.*, 976 F.Supp. 393, 399 (W.D.Va. 1997), *aff'd without op.*, 168 F.3d 482 (4th Cir.1999), *reported in full*, 1999 WL 12913, 1999 U.S.App. Lexis 475, *cert. denied*, 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000). However, I disagree with the court in *Lescs* to the extent that the court suggests that the *Papike* court was stating that the plaintiffs could not make a defective design claim based on consumer expectations because such a claim was preempted by federal regulations. *See Dow Chemical Co. v. Ebling*, 723 N.E.2d 881, 902 (Ind.Ct.App.2000) (stating that *"Papike* did not discuss preemption of design defect claims at all" and "[l]ike *Papike*, *Haddix* did not address whether a design defect claim was federally preempted"), *rev'd in part on other grounds and aff'd. in part*, 753 N.E.2d 633, 635 (Ind.2001). The *Papike* court did not discuss preemption with regards to the design defect claim; rather, the court went through the consumer expectation and risk/utility analysis required by state law. *Papike v. Tambrands, Inc.*, 107 F.3d 737, 743 (9th Cir.1997); *see Ebling*, 723 N.E.2d at 902. Though not considered binding precedent, the Fourth Circuit, in its unpublished opinion affirming *Lescs*, did not mention preemption with regard to the design defect claim but rather stated:

> The contention that [defendant] failed to meet consumer expectations must also

682 (7th Cir.1998), a case in which the plaintiff sued Playtex after contracting TSS, held that the district court's grant of summary judgment in favor of the defendant was appropriate as to her strict liability (based on a theory of design defect) claim. *Id.* The plaintiff made a similar argument in front of the district court as Murphy does presently: "[P]laintiff alleged that the super-absorbent tampons made by Playtex contained synthetic fiber as well as natural fiber, rendering them more likely to promote the growth of TSS-causing bacteria." *Id.*

The Seventh Circuit was not required to address the preemption issues as the plaintiff conceded "that the failure to warn prong is inapplicable ..., [as] all failure to warn arguments are preempted in the context of products liability cases by 21 U.S.C. § 360k(a)." *Id.* at 683. Thus, the court moved to its discussion of design defect. The court first determined that only the consumer expectation test applied, reasoning that, applying Illinois law, the risk/utility test is inapplicable when "a simple product which poses an obvious danger is alleged to be defective." *Id.* at 684 (citations omitted). The court, relying on *Papike*, determined that summary judgment was granted properly by the district court. *Id.* at 686. The court stated:

> We agree with the analysis of the Ninth Circuit. The mandated warnings on each box of Playtex tampons clearly set for the risk acquiring TSS through the use of tampons, and [the plaintiff] testi-

fied in her deposition that she had the warnings prior to her contracting TSS and was aware that there was a risk of contracting TSS when using tampons.... This evidence establishes that [the plaintiff] knew of the warnings at the time she allegedly contracted TSS, and the tampons manufactured by Playtex are not, as a matter of law, "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." ... As such, [the plaintiff's] claim for products liability fails under the consumer [expectation] test, and the district court correctly granted summary judgment to the defendant.

*Id.* (citations omitted).

I find the reasoning of the Ninth and the Seventh Circuits persuasive and I readily adopt it here. Plaintiffs can not establish that Playtex tampons are unreasonably dangerous under the consumer expectation test, which requires that the product be more dangerous than contemplated by the ordinary consumer. The reported danger of tampon-associated TSS is on every box of Playtex tampons as required by federal law. Playtex tampon boxes provide specific warnings alerting consumers to the reported risk of TSS associated with the use of tampons. TSS warnings have accompanied every box of Playtex tampons sold since 1980. Playtex's warnings, which are

---

fail. "Consumer expectations, which may differ from government or industry standards, can be established through evidence of actual industry practices, ... published literature, and from direct evidence of what reasonable purchasers considered defective." Despite the fact that consumer expectation might deviate from government mandated standards, certainly the existence of those standards, especially when they relate to the content

of product information, bears on reasonable expectations. As the district court pointed out, the warning label is approved by the EPA and it would be anomalous to hold "that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate."

*Lescs*, 1999 WL 12913, *12, 1999 U.S.App. Lexis 475, *34–35 (citations omitted).

placed three times on the outside of the box and on an insert that the consumer sees first when she opens a box each month, plainly state that TSS is associated with tampon use and that TSS warnings advise consumers to use the minimum absorbency needed to control their menstrual flow so to reduce the risk of TSS. Under such circumstances, an ordinary consumer would expect be exposed to the risk of TSS associated with Tampon use. As both the Ninth and Seventh Circuits noted, *supra*, a contrary ruling would permit "the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government mandated warnings indicate."

Moreover, Murphy, by her own admission, conceded such awareness. Prior to her illness, she was aware of the risk of TSS to all women from tampon use. Part of this understanding came from her reading of the TSS warnings contained on and within the Playtex tampon package. She followed these warnings by using the minimum absorbency necessary to control her menstrual flow and by alternating tampon use with feminine pad use. Thus, not only was the risk of tampon-associated TSS obvious, but it was admittedly understood by Murphy based upon her own prior first-hand experience with the product.

Plaintiffs argue to the contrary, citing *Rinehart v. International Playtex, Inc.*, 688 F.Supp. 475 (S.D.Ind.1988). *Rinehart* is distinguishable from the present case. In *Rinehart*, the plaintiff brought a claim against Playtex alleging injuries from TSS as a result of using Playtex tampons. *Id.* at 476. Playtex filed a motion for summary judgment arguing that the plaintiff's claims were preempted by federal regulations, that Playtex tampons are not defective as a matter of law, and that plaintiff knowingly incurred the risk. *Id.* Unlike its approach in the present case, Playtex argued that federal regulations preempted the state law plaintiffs' products liability defect design claim. *Id.* at 477, 478. The court determined that there is no federal preemption of design defect claims—a conclusion with which I agree, *supra*. *Id.* "Moreover, in *Rinehart*, the court determined that there was still a question of fact as to whether Playtex's packaging complied with the federal requirements." *Id.* at 478. That question is not posed in the present case.

Plaintiffs cite the following passage from *Rinehart*:

> Turning to plaintiff's state law tort claims, defendants argue that because of the warning statement on the package insert, any danger of toxic shock syndrome due to tampon use was patent, and that when the risk of harm is thus open and obvious, the product is not defective as a matter of law. In strict products liability cases, Indiana does apply the "open and obvious danger rule," which provides that when the danger of a product is readily apparent to the "ordinary consumer" with "ordinary knowledge," the product is not considered defective and the manufacturer has no duty to warn.... However, this rule applies to products, such as lawnmower blades, ... not to warning statements.

*Id.* at 478. In rejecting Playtex's position, the Court added:

> because the alleged risk of toxic shock syndrome from tampon use is not open and obvious, but latent, defendants had a duty to warn and, indeed, this is why the FDA has imposed a duty to warn. Accordingly, the Court finds that the open and obvious danger rule does not apply to this case and summary judgment on this basis must be denied.

*Id.* It appears, however, the court in *Rinehart* was not evaluating the design defect claim in the manner required by Maryland

law, i.e., employing either the consumer expectation test or the risk/utility test. Rather, the language used by the court appears to be similar to what under Maryland law would be considered a strict liability in tort for failure to warn. *See, e.g., Mazda Motor of America, Inc. v. Rogowski,* 105 Md.App. 318, 659 A.2d 391, 394 (1995), *cert. denied,* 340 Md. 501, 667 A.2d 342 (1995).

 Plaintiffs also argue, based on *Rinehart,* that defendant is contending that plaintiffs have assumed the risk of product use because of the package warnings. *See Rinehart,* 688 F.Supp. at 478–79. The court in *Rinehart* stated:

> Even if, as defendants assert, plaintiff read the tampon package insert on toxic shock syndrome and was aware of the risk, defendants offer no explanation of what was unreasonable about plaintiff's subsequent use of the product, unless defendants mean to imply that after having read the warning, it was unreasonable for plaintiff to use defendants' tampons at all. If so, one wonders as to the reasonableness of defendants in advertising and selling such a product. The Court finds that there is a question of disputed fact as to the reasonableness of plaintiff's use of defendants' product which precludes summary judgment on plaintiff's strict liability claim on the basis of incurred risk.

*Id.* The defense of assumption of risk is available to the defendant in design defect cases "where the plaintiff unreasonably proceeds to use a product despite a known risk or danger." *Phipps,* 363 A.2d at 960. Defendant does not argue in the present case that Murphy assumed the risk of using the product, and thus defendant is not required to demonstrate what was unreasonable about her use of the product. Rather, defendant argues that plaintiffs have not satisfied the consumer expecta-

tion test. Moreover, as defendant aptly states in its reply:

> It was not unreasonable for plaintiff or any consumer to chose to use a tampon; but as an ordinary consumer, she cannot do so and later claim that her expectations of the safety of the product are different from the federally mandated warnings. All tampons sold in the United Sates are required to carry warnings regarding the reported risk of tampon-associated TSS, which are mandated by the FDA. Playtex complied with FDA requirements regarding tampons provided consumers legally adequate warnings, including the advice that users could "avoid any possible risk of getting tampon-associated TSS and tampon use, if consumers choose to use the product, the product cannot, as a matter of law be said to present an unreasonable risk beyond contemplation of the consumer."

*Def.'s Reply to Pls.' Opposition to Def.'s Mot. for Summ. J.* at 5. This argument is compelling and fully disposes of plaintiffs' contrary contentions.

*Risk/Utility Test*

 Application of the risk/utility test requires analysis of seven factors to determine whether the product is unreasonably dangerous:

(1) The usefulness and desirability of the product-its utility to the user and to the public as a whole;

(2) The safety aspects of the product-the likelihood that it will cause injury, and the probable seriousness of the injury it will cause;

(3) The availability of a substitute product which would meet the same need and not be as unsafe;

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or mak-

ing it too expensive to maintain its utility;

(5) The user's ability to avoid danger by the exercise of care in the use of the product;

(6) The user's anticipated awareness of the dangers inherent in the product and ability to avoid the dangers, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions;

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Pease v. American Cyanamid,* 795 F.Supp. 755, 759 (D.Md.1992). Plaintiffs' burden at this stage of the case is to project evidence sufficient to enable a reasonable juror to conclude from a dispassionate weighing of the seven factors above that the Playtex tampon was unreasonably dangerous.

 Defendant argues that it can not be held liable under Maryland's risk/utility test because it acted reasonably in designing its tampons. Plaintiffs argue otherwise, claiming that the affidavits of Hanna and Tierno,

> as well as their expert witness disclosure materials, ... make out a prima facie case under the strict liability theory of a defective design claim by showing that Playtex marketed a product designed so that it was not reasonably safe because the viscose rayon material out of which it was made multiplied TSST–1 toxins generated by vaginal bacteria use, and that that defective design was a substantial factor in causing [Murphy] to become seriously ill.

*Pls.' Mem. of Law in Response to Def.'s Mot. for Summ. J.* at 8. Plaintiffs further contend that the utility of viscose rayon tampons does not outweigh the risk inherent in marketing a product that enhances the risk of TSS. *Id.* I agree with defendant for the following reasons.

The present case is similar to *Pease,* 795 F.Supp. 755. In *Pease,* the plaintiff, who was mentally retarded and suffered from myoclonic seizure disorder, sued the defendant alleging "that [the plaintiff's] mental retardation was worsened and her seizure disorder caused by the pertussis component of Tri–Immunol, a diphtheria-tetanus-pertussis ('DTP') vaccine manufactured by [the defendant]." *Id.* at 756. The defendant moved for summary judgment on the grounds that the plaintiff could not prove that her condition was caused by the vaccination with Tri–Immunol or that Tri–Immunol was a defective productive. *Id.* at 758. The court granted summary judgment to the defendant. *Id.* at 756.

The causation argument was premised "upon the contention that the opinions of plaintiff's experts are inadmissible because they are based upon data and theories which are not reasonably relied upon by experts in the field of vaccine science." *Id.* at 758. The court rejected the defendant's argument that plaintiff could not prove causation. *Id.* The court determined, however, that defendant's causation argument merged into the substantive contention that the vaccine is not a defective product. *Id.* The court stated:

> Briefly put, how can Tri–Immunol be said to be "*unreasonably* dangerous" if there is a strong consensus among the majority of physicians and scientists who have studied the issue that whole cell DTP vaccine has not been shown to cause permanent neurological damage and that it is at least as efficacious as any other available vaccine?

*Id.* The issue in the present case is somewhat different as there is no question that tampons cause TSS; rather, the issue is

whether rayon viscose tampons are more likely to cause TSS than cotton tampons.

The court then determined that the first factor in the risk/utility test clearly favored the defendant while the last four factors favored the plaintiff. *Id.* at 759. Therefore, the critical factors were numbers two and three, *supra. Id.* In the present case, it is not necessarily true that the last four factors in the risk/utility test favor plaintiffs, but for purposes of the present discussion, I will assume that they do. The *Pease* court then stated the following:

> Plaintiff contends that the proffered testimony of her experts create genuine disputes of material fact as to each of these questions. The fallacy in this contention is that what is material to the legal issue, as properly framed, is the fact that, assuming a genuine dispute between experts exists, there is a substantial body of expert opinion, supported by extensive studies conducted by independent professionals, that the whole cell vaccine is at least as safe and efficacious as acellular vaccine. To state this proposition is not to attempt to resolve the underlying scientific dispute. It merely is to recognize that in a case such as this the legal issue and the scientific question are not the same. Of course, the law can-and must-require manufacturers to foster and pay heed to the development of scientific knowledge.... However, where there is a genuine disagreement on a particular question and where the weight of scientific knowledge supports the judgment reached by a manufacturer who is marketing a socially desirable product, the law cannot permit a jury merely to substitute its own judgment that another product, preferred by plaintiff's experts, would be better. Were it do so, the law itself would be "inherently unreasonable," presenting manufacturers with a choice between Scylla and Charybdis.

*Pease*, 795 F.Supp. at 759; *see Tannebaum*, 38 F.Supp.2d at 435 (citing favorably the same passage).

I reached a similar conclusion in *Tannebaum*. I granted summary judgment to the defendant, a manufacturer of fork lifts, concluding that the manufacturer did not act unreasonably in its design choice. *Tannebaum*, 38 F.Supp.2d at 426. The plaintiff was injured while using a fork lift. *Id.* at 427. The plaintiff's design expert opined that the forklift was defectively designed because it was manufactured with a wire mesh canopy or a rear door, and thus summary judgment could not be granted. However, I rejected this argument and concluded "that a reasonable fact finder could *not* conclude" that the manufacturer acted unreasonably when it marketed the forklift as it did. *Id* at 432. This conclusion rested, in part, on the presence of "clear and adequate warnings" and the fact that engineering professionals charged with establishing national standards for the manufacturer of forklifts had twice rejected the opinion of the plaintiff's expert that a rear door should be required. *Id.* In granting the manufacturer summary judgment, I indicated that I would not permit the plaintiffs' expert to transfer his professional dispute with his peers from the laboratory and meeting room to the courtroom. *Id.* at 435.

The reasoning of *Pease* and *Tannebaum* applies to the present case.[13] Plaintiffs'

---

**13.** Plaintiffs attempt to distinguish *Tannebaum* by pointing out that I described the plaintiff's expert testimony as "non-scientific," "farfetched," and "altogether implausi-ble," and as "rank speculation." *Pls.' Mem. of Law in Response to Def.'s Mot. for Summ. J.* at 11 (quoting *Tannebaum*, 38 F.Supp.2d at 433, 434). This argument fails for two rea-

purported design defect experts contend that the Playtex tampons in issue are defective because they were manufactured with rayon fiber instead of cotton fiber. As stated *supra*, they base their opinions regarding the alleged defective nature of rayon fiber tampons upon unblinded test tube experiments. Moreover, plaintiffs' experts have conceded that no other scientist or governmental entity shares their hypothesis that rayon fiber increases the risk of tampon-associated TSS despite nearly 20 years of TSS research.

Other than the opinion of plaintiffs' experts, no laboratory, animal or epidemiological data support their hypothesis that cotton fiber tampons would present a statistically significant lower risk of menstrual TSS to women than rayon tampons. To the contrary, numerous published peer-reviewed scientific studies of both laboratory and animal tests indicate no greater quantity of TSST–1 is produced in the presence of rayon fiber tampons than cotton fiber tampons. The first published work to address the relationship of tampon fiber to production of TSST–1 concluded in 1984 that tampon fibers, including rayon fiber, did not provide nutrients for growth of TSS staph. aureus or factors that induce production of TSST–1. Since then, similar findings have been reported in other published, peer-reviewed scientific studies including articles published in 1989 and which reported on separate studies authored by Playtex's experts, Dr. Fischetti (*in vitro* testing) and Dr. Melish (*in vivo* testing). Independent researchers have reached the same conclusion. *See* Schlivert, *Comparison of Cotton and Cotton/Rayon Tampons for Effect on Production of Toxic Shock Syndromem* Vol. 172, No. 4 J. INFECTIOUS DISEASES 1112 (Oct. 1995); Parsonnet, et al., *Effect of Tampon Composition on Production of Toxic Shock Syndrome Toxin–1 by Staphylococcus Aureus In Vitro*, 173 J. INFECTIOUS DISEASES 98 (Jan.1996); Reiser, et al., *The Growth of Menstrually–Related TSS Staphylococcus aureus Isolates in the Presence of Current Commercial USA and European Tampons*, International Congress and Symposium Series 229, 125 (1998); Syverson, *The Effect of Tampon Fibre Composition of TSST–1 Production In Vitro*, International Congress and Symposium Series 229, 121 (1998).

These findings are consistent with those of the FDA and the CDC. In 1982, the FDA concluded that none of the data available to it showed "an association between the occurrence of TSS and (1) a particular tampon fiber, ingredient, or combination of ingredients ... or (2) any other product characteristic, including tampon materials, construction, design, or the manner in which the device functions ...." 47 Fed. Reg. at 26984. The FDA reached a similar conclusion in 1989 when, during its review of tampon TSS requirements, it stated that "none of the comments favoring ingredient labeling cited, discussed, or submitted any data showing an association between any particular ingredient and any risk to health, including allergic reaction, sensitivity or irritation, and the FDA is unaware of any such data." 54 Fed.Reg. at 43769. This conclusion was reinforced by the CDC which also concluded in 1989 that it could detect no influence of "chemical composition (categorized either as the

sons. First, *Pease*, the case upon which *Tannebaum* relies, does not make such remarks regarding the expert testimony in question. Accordingly (and secondly), these remarks in *Tannebaum* are only those of degree, demonstrating just how little foundation there was for the expert's opinions. It in no way means that for the reasoning of *Pease* and *Tannebaum* to apply the expert's opinion must reach the same level of implausibility as it did in *Tannebaum*.

presence or absence of a given material or as the percentage comparison by weight) on the risk of menstrual TSS." *Reingold*, S38. The FDA reiterated this point when in late 1998 and early 1999, it stated that the scientific evidence did not support the allegation that rayon fibers cause TSS. FDA Release, *supra*.

In light of the overwhelming scientific evidence that contradicts plaintiffs' pur-ported design defect experts and that support Playtex's design choice, Playtex is entitled to summary judgment as a matter of law because plaintiffs can not establish by a preponderance of the evidence to a reasonable jury a necessary element of their case—that Playtex acted unreason-

ably in designing or manufacturing tampons with rayon fiber.[14]

■ Predictably but erroneously, plaintiffs contend that Playtex is attacking the reliability of the opinions held by, and the very credibility of, plaintiffs' expert witnesses; yet, say plaintiffs, they are entitled to favorable inferences as non-movants on a motion for summary judgment. Specifically, plaintiffs cite *Graham v. Playtex Products, Inc.*, 993 F.Supp. 127 (N.D.N.Y.1998), in which the district court held that Hanna and Tierno survived a *Daubert* challenge.[15] However, defendant is in no way making a *Daubert* challenge to plaintiffs' experts, and the analysis required to determine whether a plaintiffs'

**14.** In *Papike*, the Ninth Circuit determined that the "district court properly concluded that defendant established the benefits of their tampon's design outweighed the risks inherent in the design. We disagree with [plaintiffs'] contention that in evaluating the 'risk-benefit' test, the district court improperly weighed the evidence when it rejected the affidavit of Dr. Tierno, a microbiologist who has conducted tampon/TSS testing." The court further stated:

> The district court properly determined that the Tierno affidavit was insufficient to preclude summary judgment because his test results do not establish a causal connection between the composition of Tampax Original Regular tampons and TSS. As the court observed, Dr. Tierno's research in part supported Tambrands' position, because his 1985 tests detected no toxin with the Tampax Original Regular tampon (the same result obtained with his 100 percent cotton control). Dr. Tierno's affidavit was simply insufficient to meet [plaintiff's] burden of establishing a design defect. The district court's rejection of the affidavit was not an invasion of the province of the jury, but rather part of the district court's duty to evaluate [plaintiff's] showing of the existence of some significant probative evidence.

*Papike*, 107 F.3d at 743 (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec.*

*Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987)).

**15.** In *Graham v. Playtex Products, Inc.*, 993 F.Supp. 127 (N.D.N.Y.1998), the court was presented with the question of whether plaintiff's expert witness testimony was admissible as required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The experts in the case were the same as those in the present case, Hanna and Tierno. *Graham*, 993 F.Supp. at 129. The court went through the *Daubert* test for admissibility and determined "that plaintiff's expert testimony is admissible under *Daubert*, the Court now denies defendant's motion for summary judgment on plaintiff's design defect claims." *Id.* at 134. The court concluded:

> As the Court noted in its December 8, 1997 bench decision, plaintiff's evidence, if believed by a jury, would establish a *prima facie* case of design defect based upon negligence and strict liability.

*Id.* It is easy to see how plaintiffs could make the mistake and liken the *Graham* case to the present case. However, as the court ruled from the bench, the decision that plaintiffs cite does not illuminate the reasoning behind the court's decision to deny summary judgment. *Graham* does not stand for the proposition that once an expert's testimony is determined to be admissible that a defendant manufacturer's summary judgment motion regarding design defect must be denied.

evidence presents a jury question in a claim based on design defect is altogether different from that required for a *Daubert* challenge. *Cf. Tannebaum,* 38 F.Supp.2d at 426 ("Although I would deny the motion to exclude [the testimony of plaintiffs' expert] and allow the expert to testify at trial, ... even considering the plaintiffs' expert opinion evidence, the defendant is entitled to judgment as a matter of law" based on a proper application of the risk/utility test.). The mere presence and admissibility of expert testimony challenging the design of a product does not preclude the entry of summary judgment. *Id.* Accordingly, for the reasons set forth herein, plaintiffs' contention that the jury's role in assessing credibility precludes summary judgment here is clearly unfounded, and their contention that their experts' opinion evidence is reliable is inapposite. Defendant is entitled to judgment as a matter of law as to the design defect claims.

*Negligence and Breach of Implied Warranty*

■■■ Plaintiffs allege claims for negligence, arguing that defendant owed a duty to Murphy to provide a reasonably safe product in design and manufacture and to warn of the defective nature of their tampon products containing the highly absorbent viscose rayon. As stated, the failure to warn claim is preempted by federal regulations. Plaintiffs contend that defendant breached its duty of reasonable care to Murphy by failing to design and manufacturer tampon products that did not contain the viscose rayon, failing to design and manufacture tampon products that were made of 100 percent cotton, and for otherwise failing to exercise due care under the circumstances. Plaintiffs' breach of implied warranty claim alleges that defendant impliedly warranted that its product was merchantable and fit and safe for

its ordinary purpose, yet when sold, the tampons were unmerchantable, unfit, and defective and thus resulted in severe and permanent injury to Murphy.

■■■ Defendant shall be granted summary judgment on the negligence claim for the same reasons that I have granted defendant summary judgment on the design defect claims. *Cf. Singleton v. International Harvester Co.,* 685 F.2d 112, 117 (4th Cir.1981); *Rock v. Oster Corp.,* 810 F.Supp. at 667; *see also Papike,* 107 F.3d at 743–44. I shall also grant defendant summary judgment on the breach of implied warranty claim for the same reasons. "Plaintiff's ultimate burden is whether her claim is characterized as one for strict liability, negligence or breach of warranty." *Pease,* 795 F.Supp. at 758 n. 3 (citations omitted) (internal quotation marks omitted). "Under any of the three theories the issue to be determined is 'whether a manufacturer, knowing the risk inherent in his product, acted reasonably in putting it on the market.'" *Id.* (quoting *Singleton,* 685 F.2d at 115). A negligence claim has a more onerous evidentiary burden than strict liability in torts, and a breach of implied warranty places more procedural requirements and limitations. *See Nissen Corp. v. Miller,* 323 Md. 613, 594 A.2d 564, 569 (1991) ("We adopted the theory of strict liability in tort to foreclose the unfair result 'where injured parties are forced to comply with the *proof requirements* of negligence actions are confronted with the *procedural requirements* and limitations of warranty actions.'" (quoting *Phipps,* 363 A.2d at 963)). Therefore, it is difficult to imagine how plaintiffs could meet a claim for negligence or for breach of implied warranty. Plaintiffs, in their opposition, add no additional arguments in opposition to granting defendants summary judgment to defendant on the negligence claim besides those addressed in discussing strict

liability based on a defect claim. I have discussed at length and dismissed plaintiffs' arguments, *supra.* I have already stated that defendant acted reasonably in putting its product on the market knowing the risk inherent in its product.

*Remaining Claims*

In their complaint, plaintiffs allege breach of express warranty, arguing that defendant's advertisements and promotional statements contain broad statements that amount to an express warranty. According to plaintiffs, the content of this express warranty is that defendant's tampons are not defective and that do not lead to the development of TSS in menstruating women who use their product. Defendant contends that it is entitled to summary judgment on this claim because Playtex tampons were not accompanied by an express warranty; there was no affirmation of fact or promise that Playtex did not pose a risk of TSS. Rather, defendant points out that it provided warnings, in compliance with federal regulation that stated "[t]ampons are associated with Toxic Shock Syndrome (TSS)"; "[t]here is a risk of TSS to all women using tampons during their menstrual period"; women should use "the minimum absorbency needed to control menstrual flow in order to reduce the risk of contracting TSS"; and women could avoid "the risk of getting tampon-associated TSS by not using tampons." Plaintiffs do not provide an argument in opposition as plaintiffs have not briefed the issue of express warranty in its opposition memorandum. As such, I conclude that plaintiffs have conceded that defendant should be granted summary judgment on the breach of express warranty claim.

Finally, the claims for restitution and punitive damages fail (at least) for the same reasons as the claims for compensatory damages.

(iv)

An Order effectuating the determinations made herein follows.